## CHAMBERLAIN *v.* EDDY.

1. WITNESSES — COMPETENCY — TRANSACTION WITH PERSON SINCE
   DECEASED—OBJECTION—MATERIALITY.

   Whether a witness who testified to a transaction with a person
   since deceased was disqualified by the statute is immaterial
   where the facts testified to were otherwise proved by the un-
   disputed testimony of a competent witness.

2. GIFTS—INTER VIVOS—REQUISITES.

   To constitute a valid gift inter vivos there must be a delivery,
   actual or symbolical, of the subject-matter, unless it is already
   in the possession of the donee, with an intent on the part of
   the donor to presently divest himself of all title and dominion
   over the same, and an acceptance by the donee.

3. SAME—EVIDENCE—SUFFICIENCY.

   On a bill by an administrator for a discovery and to establish
   a trust in money and property claimed by defendant to have
   been transferred to her by decedent as a gift, evidence exam-
   ined, and *held*, to support a finding that decedent in contem-
   plation of suicide transferred the property to defendant with
   the intention that it should become hers on his death if not
   called for earlier, and that a valid gift was not made, not-
   withstanding he may have intended never to call for it, and
   never did call for it.  BLAIR, MOORE, and MCALVAY, JJ., dis-
   senting.

4. TRUSTS—ENFORCEMENT—EQUITY—JURISDICTION.

   Equity has jurisdiction of a bill by an administrator, against a
   person claiming money and property of decedent as his donee,
   to establish a trust in the property, to follow the fund, and to
   restrain further disposition of the unexpended balance, and
   the bill should not be dismissed on the ground that there ex-
   ists an adequate remedy at law.

5. SAME—JURY TRIAL—PROPRIETY.

   The bill should not be dismissed on the ground that the case is
   one peculiarly adapted to trial by jury, since the chancellor
   can decide the questions as well, and the jurisdiction of equity
   being clear there is no obligation to send questions of fact to
   a jury; though if it should be thought expedient to do so, it
   should be done by sending an issue, and not by dismissing the
   bill upon the hearing.

6. INTEREST—TRUST FUNDS.

Defendant, claiming money and property of decedent as donee, on its being decreed a trust fund for the estate, should be charged interest thereon only from the date the property was demanded by the administrator.

7. TRUSTS—ENFORCEMENT—LIEN—HOMESTEAD.

Where defendant, claiming money and property of decedent in good faith as his donee, had expended a portion thereof for personal property and for improvements on her homestead, the administrator, on a bill to establish and enforce a trust, was given a lien on the personal property and improvements, exclusive of defendant's homestead rights.

Appeal from Newaygo; Palmer, J. Submitted April 14, 1908. (Docket No. 72.) Decided November 30, 1908.

Bill by Romine L. Chamberlain, administrator of the estate of Clark A. Jones, deceased, against Elda Jones Eddy for a discovery, and to establish a trust. From a decree for complainant, defendant appeals. Modified and affirmed.

*John G. Anderson* (*Edwin H. Lyon*, of counsel), for complainant.

*William Carpenter*, for defendant.

HOOKER, J. Clark Jones was one of eight brothers and sisters. He died a suicide on January 21, 1906, at Shreveport, La. On December 17, 1905, he was the owner of a farm and some personal property, which last included two certificates of deposit for the sums of $600 and $1,800, respectively, and two promissory notes, an uncollected claim for $30.29, and an interest in the estates of his father and mother, then in process of settlement, and practically ready for distribution. He had been in the habit of keeping the aforesaid certificates and notes in the safe of his sister Mrs. Eddy, the defendant, at her home, and after his death these papers were found to be indorsed in blank by him, as appears from her testimony, she having been called as a witness for the complainant at the hear-

ing in the circuit court. She testified, in answer to questions asked by complainant's counsel, that she had cashed the checks and deposited the money in her own name, collected the claim for $30.29 and the interest on the notes; that she had loaned $300 upon a mortgage, and afterwards sold it for an interest in some land owned in common by herself and two sisters, upon which land she resided, and paid her $100 in addition to the mortgage. She expended $800 upon a barn which she erected upon the same premises. She bought a team, wagon, farming implements, buggy, harness, etc. She paid for the removal and burial of Clark Jones, and at the time she testified had some money and some notes left of the property. So much appears in the direct examination by complainant's counsel of the defendant. The complainant is the administrator of the estate of Clark Jones. He filed a bill in equity for discovery, claiming that defendant's actions, doings, and claim of ownership were fraudulent, that there was danger of the property being disposed of by her, and lost to the estate of Clark Jones, and praying that a decree be made adjudging that the said money, promissory notes, and the lands purchased with the money obtained by defendant constitute a trust fund for said estate, and for a lien upon any and all lands of said defendant upon which she had used any of said money in making improvements, and that it be sold to pay all such sums, and that she be required to convey to the estate all property purchased by her with any of said money. An injunction pendente lite was prayed and issued.

The defendant claims that she became the owner of all of said property, except the farm (which is not in dispute) by gift from her brother Clark Jones in December, 1905, about the time he left home. It is claimed, on her behalf, that this proceeding is not a proper one, for the reason that there is an adequate remedy at law. To maintain her claim to the property, the defendant brought out, through cross-examination of the defendant, the following testimony: Clark Jones lived at Troy, 16 miles from de-

fendant's home. He went to her home the evening before he left home, and his papers were then in the safe. They had a conversation as follows:

" He asked me to open the safe so that he could fix the money so that I could get it. I opened the safe. I did not take out the papers myself. I knew they were there. He went to the safe and took the papers. I didn't see him indorse them. I found them there that morning that he went away. It was that morning that he asked me to open the safe. After he left I found them there, and they had his indorsement on each one of them, the certificates and the notes. After he went out of the house he went to the barn. He asked me if my nephew had come in from the barn, and I told him no, and he went to the barn. I don't know of my own knowledge that he talked with my nephew. * * * My nephew's name is Earl R. Leland. He talked with me after my brother went away, the same morning after I had last seen my brother. * * * My nephew said that Clark said for me to deposit the money in my own name so that I could have the same to use, and it would be handy for him to use when he was up North to send him some. I was not married at that time. I was living in the old homestead, and had lived there all my life. My father and mother were both dead. Their estates were partially administered. He left, besides these certificates and notes and an account for lumber, another paper. This is the paper written on the back of a receipt. * * * That is my brother's signature and his handwriting. I found that the morning that he went away. I had possession of the safe, and had given my brother permission to put the things there, and they were all left in my possession. The paper is directed to Mr. A. O. White. He was the administrator of father's and mother's estate at the time. There was still something unpaid to the heirs in his possession."

The witness also stated that a paper writing was found with the certificates. The paper referred to is as follows:

"Mr. A. O. WHITE,

" Please pay my share of the estates to Elda A. Jones, and oblige,

"CLARK A. JONES."

"There was never any instruction given by my brother, either verbally or in writing, qualifying this order in any

way or bearing on it. There was never anything given to me, or that came to me, indicating that I should not use this for myself if I could get it. My brother lived with me at one time. He was sick at my house with smallpox in the spring of 1904. He was near to death. I took care of him during that sickness. I nursed him through the entire sickness. After that I lived with him as his housekeeper, and took care of him so far as a housekeeper would. My relations with him were very close."

The foregoing testimony was taken under objection, it being claimed that defendant was disqualified as a witness, by the statute; but as Mamie Brittan testified substantially the same, and there was no contradiction, the admissibility of defendant's testimony is not important. She stated:

"I live in Dayton township, and am a sister of Clark Jones and Mrs. Eddy. I was at their home at about the time he left. The last place that I remember seeing him was as he came from the room where the safe that has been spoken of was, from the room where I was in the house there. That was just shortly before he took his departure. I heard a conversation between him and Mrs. Eddy. In his peculiar way he had of saying things—of course, we had no idea of its coming to this—I could not say right definite, but this is what it was, as near as I can recall it now: It was that he asked her to open the safe for him so that he might fix his check so that she might get the money to pay his taxes for him. I don't know as I am telling it just as it was. He had spoken to her about paying his taxes for him, and as I understand, he had also made arrangements with the bank so that he could leave the money so that she could get it. He says, 'You open the safe, and I will fix that so you can get the money, and then you can—' I am under oath, and I want to be pretty careful in what I am saying here—he says, 'I will fix this so that you can get the money to pay my taxes, and you might want to use some.' That is the substance of what he said, as near as I recall it now. I had no other conversation with him, and did not hear him say anything of this character at any other time. He came to the house the evening before, and stayed there all night. I was staying at the house at that time. That is all the conversation that I can now remember.

Mrs. Eddy went into the room, and, as I suppose, opened the safe for him. As the safe was in the other room, and positively out of my sight, I cannot say that she opened the safe. He went into the room. I didn't see him while he was in there. Afterwards he came out, and I saw the certificates and the notes. They were indorsed in his handwriting and his name. I don't know whether I ever saw them before or not."

Earl R. Leland, a nephew of Clark Jones, testified:

"I have made my home principally with my aunts Mrs. Eddy and Mrs. Brittan, in Dayton township. I am a nephew of Mrs. Eddy and of Clark Jones. I knew him in his lifetime. I have known him ever since I was big enough to know anyone, and before he left Dayton I saw him occasionally. He was back and forth there. I knew of his having the smallpox. Elda Jones took care of him that time. Afterwards she kept house for him as long as he stayed on the place. I think he thought more of her than he did of any of the rest of them. I could not help but think it. I drew that from his general conduct, and from his actions. I was situated so I would have a pretty fair opportunity to know. He always showed a large amount of affection for her, more for her than any of the rest. There was friction or difficulty between the members, growing out of the settlement of the estates. I could not say what it was. I think it affected Clark Jones to some extent. I last saw Clark Jones the morning that he left the home place, some time in December. I don't remember the date. I was right in the road between the house and the barn when I last saw him. I had a conversation with him prior to that time. Our conversation was at the barn. He came to me where I was milking. He sought me out and spoke to me. * * * As near as I can remember, Clark Jones at that time told me to tell Elda to take that check that was due in a few days and the timber money, and deposit it in her name so that, if he wanted to get some of it, he could get it a little handier, and she might want to use some of it. That is as near as I can remember what he told me. There was no further conversation there in regard to this property. He wanted me to put in some wood for him at Fremont— cut up some tops out of his timber. When he went down the road, I asked him which way he was going, and he said he didn't know which way he was going. Those were his last words to me."

Mrs. Ida M. Newlun testified:

"I am Clark A. Jones' sister. I live about six miles away. I had not seen him for about three months before he went away. I think that he had more affection for Mrs. Eddy than for any of the rest of us. They had been. together for the last four or five years. * * * I am one of the heirs of his estate. I think he intended to make a gift of the.property to Elda Eddy."

Fred Reynolds testified:

"I live in Fremont, and am in the Old State, what was formerly the First Bank. It changed its name in August last year. I knew Clark Jones in his lifetime. I had a conversation with him shortly before he died. It occurred in the bank. He called one day, and asked if we could pay his certificates to anyone by presenting them. I told him we would on his say-so, but the proper way was to have them indorsed, and he made some remark about his sister Elda paying some taxes, and I don't remember what else. He made some remark about paying his taxes, and I explained to him how he could indorse them to turn them over to anyone, but I don't think he made any remark at all, and passed out. That is all I know that was said.

"*Q.* And he had reference to his sister getting the money— Did he make mention that it was his sister that was to draw them?

"*A.* No; he just made a remark about how she could draw the money, and as he went out, he made some remark about paying taxes. The certificates were issued by our bank. They were indorsed when they were presented in his name and his handwriting."

On cross-examination he said:

"He wanted to know if anybody else could draw that money out of the bank on those certificates, and he mentioned that he wanted Elda to pay his taxes. He did not say that he wanted it drawn for that purpose. He wanted to know if she could draw that money, and at the time he mentioned that he wanted to pay some taxes."

The foregoing is all of the testimony relating to the transaction relied upon to prove a gift. There is testimony in the record of surrounding circumstances, how-

ever, which are relied upon as tending strongly to establish an intent upon Clark Jones' part to give the property to Mrs. Eddy. There was testimony tending to show that he was partial to her, and on ill terms with most of his other brothers and sisters; that he had suffered a matrimonial disappointment, and had trouble with the township authorities relating to a road; that he had said that life was not worth living a few days before he left; that he had peculiar ways of doing things, and an instance of this kind was stated by defendant:

"He had given me things before this time. When I was going to town he would give me some money.

"*Mr. Anderson:* I object to that as incompetent and immaterial to show a gift in this case.

"*Q.* Do you remember of his giving you a calf at one time?

"*A.* Yes, sir.

"*Q.* State how he did that. What was his manner?

"*A.* Why, he asked me if I had fed the calf yet, and I supposed— He hadn't said it was mine, but he kept calling it mine, and he said, 'Have you fed your calf?' So I got to claiming it, and when he moved away he wanted to know if he should take care of it for me that summer, and I told him yes, and so when it was a cow, he brought it back to me.

"*Q.* Do you remember one time you were talking about it, and you called his attention to the way he has been talking?

"*A.* Yes, sir.

"*Q.* What was that?

"*A.* He said, 'If I call it yours, can't you—' I can't use the exact words.

"*Q.* Do you remember of your saying to him when he spoke of it as your calf that if he kept on calling it yours, you would claim it?

"*A.* Something that way.

"*Q.* And what was his answer?

"*A.* He said if he called it mine, I could—or something. He calculated it was mine, or something like it. I don't remember.

"*Q.* And you called it yours?

"*A.* Yes, sir; that was his mode of doing it. He was very peculiar."

This testimony was objected to.  At the time he left he sent the following letter to his brother Judd, of whom he was fond:

"FREMONT, MICHIGAN, 12 /19–05.

"Well, Judd, I could not do anything with the board, so I wish you would sell off the stock and stuff and get all you can for it and take pay for your trouble out of the proceeds.  Let Earl take the plane, square, saws, pincers, hammer, chains, bit stock and bits until I call for them.  I am looking for another location.  You can fence up the road and do what you think best with the farm.

"CLARK A. JONES."

William Taylor, a blacksmith, testified:

"I live in Fremont, and am a blacksmith.  I knew Clark A. Jones in his lifetime.  I saw him a great many times at my shop.  I had a conversation with him at one time in regard to himself and his family.  I should judge it was in November before he went away.  I cannot tell how long it was before he went away.  The nearest I can come to it, he came there about ironing a pair of bobs.  I should judge it was in November, maybe in October, possibly.  He said he thought there was difference in the family.  He seemed to think they could not agree on anything, any one of them.  He was complaining about it.  He had some trouble with the township or something.  I understood it to be at Troy, I think about the road.  He said he had bought it.  At some time there was a road running past the place.  I guess he didn't like it, and I don't believe it was really intended to be there, and he bought it, and he opened it.  He paid them $100 for it, and after they took his money, they were about to back out on it and wanted him to take his money back.  They was going to change the road, what he told me.  At that time I didn't think it had been settled against him.  It was still under discussion, the way I understood it.  He showed some feeling in regard to it, and didn't seem to like it.  He seemed to think he would rather have the road than the money.  He didn't like the idea of their giving the money back.  There was quite a little talk about that, and about dividing some of the property that he could not divide.  That seemed to bother him.  I asked him some questions, and he told me a good many things.  It seemed that there was some young stock, horses and cattle, that he could not divide

with his brothers and sisters. He was complaining about that country not being fit to live in, almost out of the world, lonesome. I said, ' Why don't you get married and fix you up a place and build a house ? ' The answer was that he did not know anybody that would have him. He tried one, and she would not have him. He could not get the lady he wanted. He said, ' I don't know as I blame her any for not going up there.' He said he did not think his life was worth living. He seemed to be depressed quite a little over the three matters and family troubles."

There is little conflict of testimony in the record. The learned circuit judge held that the proof failed to sustain defendant's claim, and made a decree for complainant. If we consider the testimony of the defendant, Mrs. Brittan, Leland, and Reynolds by itself, disregarding the other circumstances, we shall find it difficult to say that the transaction amounted to a gift. Clark Jones did not intimate to the banker or to his sister or to Earl Leland that he intended to give defendant this property. Apparently he placed it where she could get it, for his use, and incidentally indicated that she might want to use some of it herself. It is doubtful whether he said that she should transfer more than the $600 certificate to her own account, and nothing was said as to his destination or the period of his prospective absence. He indicated an expectation that he might want her to send him some of the money, and that he was fixing his affairs so that she could do so upon request. On the other hand, the succeeding events cast a light upon the transaction which is quite consistent with the defendant's claim that he intended that she should have the property. In the first place we are impressed with the fairness of the defendant's conduct throughout this affair. She made no disposition of his property until she learned of his death. She appears to have concealed nothing from others. She advised with counsel and others as to her rights, which she was not overhasty to assert. Her testimony is free from color, though it is not difficult to see where slight changes might

have materially strengthened her case. While there is language in itself inconsistent with an intended gift, it is also consistent with a design to take his own life, which intention he did not wish to disclose, and to place his property in her control for her use and ownership, disclosing such intentions as far as he could without arousing suspicions as to his other intentions. The letter to Judd Jones is susceptible of a construction similar to that claimed for the transaction with the defendant. It seems clear that his brothers and sisters were allowed to understand that he was going away for an indefinite period; that he was making no plans for the conduct of his farm. He directed that his tools be delivered to his nephew, till called for, his stock sold with no directions regarding the proceeds, except such as should be required to pay Judd for his trouble, who was to fence up the road, and do what he thought best with the farm. If $100 was coming to him from the board, as may fairly be implied, he does not mention it. He vouchsafes only the explanation "I am looking for a location." These entire transactions, when read in the light of later events, are suggestive of final disposition, veiled only so far as to him seemed necessary to avoid disclosure of his ulterior designs. Read in the light of these events, the letter to Judd is pathetic in what it omits, as well as in what it contains, and at first blush it may seem that here was such a delivery from the donor to the donee as would place the property within the dominion and control of the latter, with intent to transfer the title. *Gray* v. *Barton*, 55 N. Y. 72.

We recognize the rule that, in order to constitute a valid gift,

"There must be a delivery, actual or symbolical, of the subject-matter, unless it is already in the possession of the donee, with an intent on the part of the donor to presently divest himself of all title and dominion over the same, and an acceptance by the donee."

The intent may be deduced from all the circumstances.

From the language used alone we would not say that an unconditional gift was intended, but when viewed in the light of his contemporary and subsequent acts, it may reasonably be inferred that it was his intention to give this property to his sister and to take his own life. Had he immediately committed suicide, it would be a very natural conclusion. But it requires more than an intention to make a gift. It would require no stretch of imagination to infer an intention that the defendant should become the owner of this property after his death if not called for earlier, but this would be inconsistent with the theory of a present gift, and though he may have intended never to call for it, the fact that his language implied a reservation of the right to do so precludes the conclusion that he made a valid gift. The language used reserved the right to call for this property, and if it could otherwise be considered a gift, the right to revoke it, being reserved, would be fatal to it. Not only does the language clearly imply the reservation of this right, but the defendant evidently so understood it, and would have recognized the right had he sought to exercise it. In fact it appears pretty conclusively that she had no suspicion that she was the recipient of a gift, in the legal sense, previous to her brother's suicide. This is implied by her conduct, and is inferable from her testimony. Having reached the conclusion that the defendant's claim cannot be sustained, some other questions demand attention.

*Jurisdiction.* It is contended that the bill should be dismissed, for the reason that there was an adequate remedy at law, and it is said that the case is one peculiarly adapted to trial by jury. We are of the opinion that equity has jurisdiction in this case, *first*, to declare that the property received was a trust fund, and to follow the fund and enforce payment against property purchased by it; *second*, to restrain by injunction the further disposition of the unexpended portion of the property. We are not impressed with the importance of a jury to decide any question in the case. A chancellor can do it as well. Where

the jurisdiction of equity is clear, as in this case, there is no obligation to send questions of fact to the jury, and if it be thought expedient to do so, it should be by sending an issue to a jury, and not by dismissing the bill upon the hearing.

*Interest.* We are of the opinion that interest should be allowed only from the date of a demand made by the administrator upon her for the property.

*Lien.* We cannot sustain the decree in its provision that the same shall be a lien upon defendant's homestead. We think that the same may well be decreed to constitute a lien upon the personal property purchased by the fund, and the sum invested in buildings and improvements upon the land should be a lien thereon, exclusive, however, of defendant's homestead rights therein; such sums to be determined on the settling of decree.

In all other respects than as hereinbefore indicated, the decree will be affirmed. Neither party will recover costs of this court.

GRANT, C. J., and MONTGOMERY and OSTRANDER, JJ., concurred with HOOKER, J.

BLAIR, J. ( *dissenting* ). Complainant filed his bill of complaint as administrator of the estate of Clark A. Jones, deceased, charging, briefly, as follows: That Jones died on or about January 21, 1906, at Shreveport, La., and that he was at that time a resident of Newaygo county. That at the time of his death Jones was the owner of two certificates of deposit issued by the First Bank of Fremont, one for $600, and the other for $1,800, two promissory notes, one for $51, made by Jake Rozema, and the other for $80, made by Charles Emmons, and also an account of $30.29 for timber which he had sold. That previous to his death Jones had kept his valuable papers in a safe in the home of defendant, who was his sister, and that upon going to Louisiana shortly prior to his death, he left said certificates of deposit and promissory notes in the safe, in accordance with his custom, and that

shortly after his departure, defendant obtained the money on the two certificates of deposit, depositing such money in the same bank, and that she converted all of the property mentioned to her own use. Defendant's answer practically admits the foregoing allegations, except that she claims that Jones gave her the property referred to shortly before his departure. That defendant used the moneys in question in purchasing a piece of land described, in Newaygo county, and in building a barn and making other improvements thereon, and she admits that she used a part of the money in building the barn and making improvements on the land referred to, and does not deny that she converted all of the property to her own use. That complainant demanded the property in question as a part of the estate of Clark A. Jones, and that Mrs. Eddy refused to turn over any portion of the property, averring that she, in good faith, claims the property as her own, and relying upon a gift of the same to her by her brother. The safe in which the papers were kept belonged to defendant, and she alone had a key thereto. The case was heard in open court, and a decree was made holding with complainant, and granting him the relief prayed for, and making the amount which was found to be due to the complainant a lien upon the land referred to, and the personal property thereon which had been bought with some of the moneys mentioned. Defendant appeals from this decree.

Clark A. Jones in his lifetime lived at Troy, about 16 miles north of defendant's home. He was a bachelor, and owned and cultivated the place where he lived, and was keeping house by himself at the time he went away. The record shows, as we think, that he was a peculiar man, not possessed of the will power of the average normal man, and with a tendency to be disturbed by trifles, and towards a melancholic frame of mind. We are also satisfied from the evidence that he thought more of his sister, the defendant, than of any other member of his family, and that he had trouble with some of the others. He came to defendant's house the night of the 18th of December, and

went away the morning of the 19th.    Prior to going away, as defendant testified:

"He asked me to open the safe so that he could fix the money so that I could get it.   I opened the safe.   I did not take out the papers myself.   I knew they were there. He went to the safe and took the papers.   I didn't see him indorse them.   I found them there that morning that he went away.   It was that morning that he asked me to open the safe.   After he left I found them there, and they had his indorsement on each one of them, the certificates and the notes.   After he went out of the house he went to the barn.   He asked me if my nephew had come in from the barn, and I told him no, and he went to the barn.   I don't know of my own knowledge that he talked with my nephew.   *   *   *   My nephew said that Clark said for me to deposit the money in my own name so that I could have the same to use, and it would be handy for him to use when he was up North to send him some.   I was not married at that time.   I was living in the old homestead, and had lived there all my life.   My father and mother were both dead.   Their estates were partially administered.   He left, besides these certificates and notes and an account for lumber, another paper.   This is the paper written on the back of a receipt.

"*Mr. Anderson:* I object to the introduction of the paper.

"That is my brother's signature and his handwriting. I found that the morning that he went away.   I had possession of the safe, and had given my brother permission to put the things there, and they were all left in my possession.   The paper is directed to Mr. A. O. White. He was the administrator of father's and mother's estate at the time.   There was something still unpaid to the heirs in his possession.   *   *   *   The paper was offered in evidence, and marked 'Exhibit D1,' and reads as follows:

"'Mr. A. O. WHITE,

"'Please pay my share of the estates to Elda A. Jones, and oblige,

"'CLARK A. JONES.'

"In accordance with my nephew's report to me, I took the certificates to the bank, they being indorsed, and had them put in my name.   I did that, in good faith, believing that my brother designed that I should do it, and

that I had a right to use them.   I collected the interest on the notes, but not the principal.   I renewed only one note.   *   *   *

"My brother died in Shreveport, and my brother-in-law went after the body.   He died in lodging rooms there, and a bottle that had carbolic acid in was found near him. At the time it had the appearance of his having taken carbolic acid.   He was not married.   He had a disappointment, I think, some short time before he left.   There was a lady in the county whom he desired to marry.   She married someone else.   I don't know whether he ever proposed to her or not.   *   *   *

"*Q*. Earl Leland told you, did he not, that Clark said: 'Take that $600 certificate and deposit it in the bank in your own name so that he might get money from you handy in case he wanted it?   Isn't that so?

"*A*. He said I might want some to use, and it would be handy for him when he was up North.

"*Q*. So that you could send it to him?

"*A*. I think so; yes.   He didn't say anything about promissory notes, nor about the $1,800 certificate.   *   *   * [Counsel shows witness a paper.]   I recognize the writing. It is Clark A. Jones'.   It is his signature.   The paper was offered and received in evidence, and marked 'Exhibit C2.'   It is as follows:

"'FREMONT, MICHIGAN, 12-19-'05.

"'Well Judd, I could not do anything with the board, so I wish you would sell off the stock and stuff and get all you can for it and take pay for your trouble out of the proceeds.   Let Earl take the plane, square, saws, pincers, hammer, chains, bit stock and bits until I call for them.   I am looking for another location.   You can fence up the road and do what you think best with the farm.

"'CLARK A. JONES.'

"Judd is my brother Judson Jones.   *   *   *   I think I told my brothers and sisters, in talking with them, that I wished I knew for sure whether Clark intended the money for me or not, so that they would be satisfied.   I am satisfied in my mind.   *   *   *   Mr. Mansfield, my brother-in-law, went after my brother's body, and returned with it.   He brought this book.   He said he found it, or they gave it to him down there where he was, and he said it was stuck in back of the door-casing in the room occupied by my brother.   The writing in it was my brother's handwriting.   The book referred to was marked

'Exhibit D4,' and the writing was read in evidence, as follows: 'Tell them that I died with a broken heart.' There had been more or less friction and trouble in our family with regard to these other estates. There had been some difference between Clark Jones and the other brothers and sisters."

The nephew, Earl Leland, testified:

"I last saw Clark Jones the morning that he left the home place, some time in December. I don't remember the date. I was right in the road between the house and the barn when I last saw him. I had a conversation with him prior to that time. Our conversation was at the barn. He came to me where I was milking. He sought me out and spoke to me.   *   *   *   As near as I can remember, Clark Jones at that time told me to tell Elda to take that check that was due in a few days and the timber money, and deposit it in her name so that, if he wanted to get some of it, he could get it a little handier, and she might want to use some of it. That is as near as I can remember what he told me. There was no further conversation there in regard to this property. He wanted me to put in some wood for him at Fremont—cut up some tops out of his timber. When he went down the road I asked him which way he was going, and he said he didn't know which way he was going. Those were his last words to me.   *   *   *   In his conversation he spoke that he would want to send down when he was up North so that if he wanted some he could have her get it and send it to him. The money then was in the bank in his name.   *   *   * [The witness is shown letter (Exhibit C2).] I think I have seen that letter. I am the 'Earl' that is mentioned there. Clark did not say anything to me about this. I think this was written the day he left. I saw it before his death."

A sister, Mrs. Brittan, testified as to the conversation in the house:

"He says: 'You open the safe, and I will fix that so you can get the money, and then you can—' I am under oath, and I want to be pretty careful in what I am saying here—he says: 'I will fix this so that you can get the money to pay my taxes, and you might want to use some.' That is the substance of what he said, as near as I recall it now."

Mr. Reynolds, cashier of a bank in Fremont, testified:

"I had a conversation with him shortly before he died. It occurred in the bank. He called one day, and asked if we could pay his certificates to anyone by presenting them. I told him we would on his say-so, but the proper way was to have them indorsed, and he made some remark about his sister Elda paying some taxes, and I don't remember what else. He made some remark about paying his taxes, and I explained to him how he could indorse them to turn them over to anyone, but I don't think he made any remark at all, and passed out. That is all I know that was said.

"Q. And he had reference to his sister getting the money? Did he make mention that it was his sister that was to draw them?

"A. No; he just made a remark about how she could draw the money, and as he went out, he made some remark about paying taxes. The certificates were issued by our bank. They were indorsed when they were presented, in his name and his handwriting.

"Mr. Anderson: No question about that.

"Clark Jones has had money in the bank for a long time. It was represented by those certificates of deposit. There was one certificate of deposit for $600, dated December 21, 1904, No. 22,456. It was paid in December, 1905. I cannot say to whom it was paid. I think Mrs. Eddy presented both of these certificates. One of them is dated April 12, 1905, No. 23,227, for $1,800, paid December, 1905. Those certificates represented money that he had had in the bank for a long time. They would be renewed each year. He would come and collect the interest on them each year and get a new certificate. The last time that they were renewed would give those dates. He had had the money in the bank for several years. He wanted to know if anybody else could draw that money out of the bank on those certificates, and he mentioned that he wanted Elda to pay his taxes. He did not say that he wanted it drawn for that purpose. He wanted to know if she could draw that money, and at the time he mentioned that he wanted to pay some taxes."

William Taylor testified:

"I live in Fremont, and am a blacksmith. I knew Clark A. Jones in his lifetime. I saw him a great many times at my shop. I had a conversation with him at one

time in regard to himself and his family. I should judge it was in November, before he went away. I cannot tell how long it was before he went away. The nearest I can come to it, he came there about ironing a pair of bobs, I should judge it was in November, maybe October, possibly. He said he thought there was difference in the family. He seemed to think they could not agree on anything, any one of them. He was complaining about it. He had some trouble with the township, or something—I understood it to be at Troy—I think, about the road. He said that he had bought it. At some time there was a road running past the place. I guess he didn't like it, and I don't believe it was really intended to be there, and he bought it, and he opened it. He paid them $100 for it, and after they took his money they were about to back out on it, and wanted him to take his money back. They was going to change the road, what he told me. At that time I didn't think it had been settled against him. It was still under discussion, the way I understood it. He showed some feeling in regard to it, and didn't seem to like it. He seemed to think he would rather have the road than the money. He didn't like the idea of their giving the money back. There was quite a little talk about that, and about dividing some of the property that he could not divide. That seemed to bother him. I asked him some questions, and he told me a good many things. It seems that there was some young stock, horses and cattle, that he could not divide with his brothers and sisters. He was complaining about that country not being fit to live in, almost out of the world, lonesome. I said: 'Why don't you get married, and fix you up a place and build a house?' The answer was that he did not know anybody that would have him. He tried one, and she would not have him. He could not get the lady he wanted. He said: 'I don't know as I blame her any for not going up there.' He said he did not think his life was worth living. He seemed to be depressed quite a little over the three matters and family troubles."

Adelbert Mansfield, a witness for complainant, and husband of a sister of decedent, testified, as follows:

" I went for the body, and I brought back 'Exhibit C3,' this book. A bottle of carbolic acid was found.
" *Q.* And he had taken it?
" *A.* Well, that was a question whether he took it

or not. It is supposed he did. The empty bottle was found in the room. There were marks on him to indicate that he had taken it, and that was the only way that they could account for his death."

Complainant called defendant as a witness, and questioned her fully about the certificates and notes, except as to her conversation with decedent, and she had been examined in the probate court upon written interrogatories, and had testified substantially as in this case. Under such circumstances we think her testimony was admissible. *Fox* v. *Barrett's Estate*, 117 Mich. 162.

The principal question for our determination is whether, under the circumstances, decedent made a gift of the certificates and notes to Mrs. Eddy. The answer to this question must depend largely upon our determination as to the intention with which he indorsed the certificates and notes. It seems clear from the testimony that there was a delivery of the certificates and notes for some purpose, either to Mrs. Eddy, in trust, to hold for the benefit of her brother, or to her absolutely for her own property. If the language used by decedent is to be taken at its face value, then the delivery was manifestly in trust and without an intention to part with the right of disposal of it. If, however, the intention, notwithstanding the language used, was to put the ownership in Mrs. Eddy, then she is entitled to hold the property. The indorsement of the certificates and notes and the delivery to Mrs. Eddy, if nothing had been said at all to qualify the act, would have vested the title in her. *State Bank of Croswell* v. *Johnson*, 151 Mich. 538.

In determining whether his intention was expressed by his words or otherwise, it is necessary to consider all the circumstances of the case. The amount of the taxes, as appears from the record, was some $6 or $7, and it seems unreasonable to suppose that Mr. Jones was indorsing certificates of deposit, amounting to $2,400, and notes and a timber claim, for the purpose of enabling his sister to pay his taxes. It seems equally unreasonable to suppose that

he turned this amount of property over to her for the wholly unnecessary purpose of sending money to him at his place 16 miles north. It becomes still more unreasonable, when we find from his letter that he did not intend to go back North, but intended to change his location, and from his statement to his nephew—the last words that he said—that he did not know where he was going. On the other hand, it appears altogether reasonable that, if decedent had arrived at that desperate state of mind where he intended to take his own life, he would have endeavored to conceal this intention from his sister, and upon this view the language used becomes at once consistent with his subsequent acts. His peculiar character, his conversation with the blacksmith, the reason assigned for his suicide, that he died of a broken heart—a condition which would not arise within a brief period—the giving of his interest in the two estates to his sister, the letter which he wrote to his brother Judd, and all the facts surrounding the case, viewed in the light of the culminating tragedy, leave no doubt whatever in my mind that at the time decedent indorsed these notes and certificates he fully intended to give them absolutely to his sister, and went to his death with the belief that he had accomplished his purpose.

The decree should be reversed, with costs of both courts to defendant.

MOORE and McALVAY, JJ., concurred with BLAIR, J.