ANDREWS *v.* LAVERY.

1. APPEAL AND ERROR—CONTENTS OF RECORD—NARRATIVE FORM REQUIRED.

    A chancery record which consists of a copy of the stenographer's minutes of testimony, including the colloquies of counsel and question and answer, is not in accordance with 3 Comp. Laws, § 10188, requiring that the record be settled as in actions at law.

2. INCOMPETENCY—EVIDENCE.

    A man of 58 years of age who, although affected by Bright's

disease, is able to comprehend the purpose of a transfer of insurance from his wife to his daughter, and whose intention appears rational, is properly held to have been competent to execute the transfer.

3. UNDUE INFLUENCE—EVIDENCE—INFERENCES.

Undue influence is largely a matter of inference from facts and circumstances, including the character, disposition and mental condition of the person influenced, and the opportunity to influence him.

4. SAME.

A finding of undue influence is sufficiently supported by testimony that the grantor left his wife, who was insane and had only a small amount of property, without any of his estate for her support, and transferred it all to his daughter who was married and sufficiently provided for, that he was enfeebled by disease, was away from the wife and within the influence of his daughter, that no ill feeling towards his wife existed, and no other means of influencing him to make the transfer of insurance to the daughter were disclosed.

5. CONTRACTS — SPECIFIC ENFORCEMENT — PAROL ANTENUPTIAL AGREEMENT—FIDUCIARY RELATION.

A parol antenuptial agreement, valid because executed on the one side and because of execution tendered on the other, providing for a transfer of insurance to the wife in consideration of a devise of realty may not be annulled by one of the parties who was, at the time of the attempted annulment, the husband and guardian of the other, the alleged reason for the rescission being that the wife was incompetent to execute her part of the agreement.

Appeal from Bay; Collins, J. Submitted October 12, 1909. (Docket No. 52.) Decided December 10, 1909.

Bill by Martin M. Andrews, guardian of the estate of Agnes C. Cole, against Mabel Lavery and Arthur Lavery to set aside a change of beneficiary in a policy of insurance. From a decree for complainant, defendant Mabel Lavery appeals. Affirmed.

*Stoddard & McMillan,* for complainant.

*T. F. Shepard,* for appellant.

Agnes C. Cole, the ward of complainant, is the widow of Fred B. Cole, deceased, and defendant Mabel Lavery is his only child by a former marriage. These two are the sole heirs at law of the deceased. Mr. Cole married his second wife in August, 1905. In 1906 she became affected with some mental disorder. For a short time she was in the local hospital at Bay City. She was then taken to a private asylum at Flint. On December 28, 1906, Mr. Cole filed a petition in the probate court, praying that his wife be declared insane, and admitted to the Eastern Michigan Asylum for the Insane at Pontiac, there to be supported at the expense of the county. Hearing was fixed for December 31st, and on that day, upon the certificate of two physicians, she was adjudged insane and a fit person for care and treatment in said asylum, and it was ordered that she should be admitted as a private patient. By said order Mr. Cole and the defendant Mabel were authorized to remove Mrs. Cole to said asylum; and on January 30, 1907, they removed her to that institution. Meanwhile she had remained in the private asylum at Flint.

On December 29, 1906, Mr. Cole filed a petition in the probate court, alleging that his wife, Agnes C. Cole, had personal estate of the estimated value of $2,500; that, by reason of her insanity, she was incompetent to have the care and management of her estate, and praying that he be appointed as her general guardian. On January 8, 1907, he filed another petition, alleging that she had personal estate of the estimated value of $1,350, and prayed to be appointed special guardian; that she was then undergoing treatment at the Oak Grove Sanitarium at Flint; and that it was necessary to use a portion of her estate immediately for said treatment and other expenses. He was appointed special guardian with a bond of $2,000, which he furnished. On February 5, 1907, Mr. Cole was appointed general guardian of his wife, and qualified by filing the required bond in the sum of $2,000. On February 12th he filed with the probate court his account as

special guardian, amounting to $361.57. This account included expenses for her treatment in the private hospital at Flint, for her removal to Pontiac, physician's bills, and attorney's fees.

Mr. Cole died March 11, 1907. On April 29, 1907, defendant Mabel was appointed administratrix of her father's estate. After Mr. Cole's death, complainant Andrews was appointed guardian of Mrs. Cole. On May 10, 1907, he filed a petition for the removal of Mrs. Lavery as administratrix. On May 31, 1907, she was removed, and one Charles C. Cottrell was appointed administrator in her stead. On September 3, 1907, defendant Arthur M. Lavery, the husband of Mabel, filed a claim against Mr. Cole's estate for nursing and care of person and property of Fred B. Cole from November 2, 1906, to March 11, 1907, $387, and expenses from Tonawanda, N. Y., to Bay City, Mich., $8.50.

Mr. Cole at the time of his second marriage had three policies of life insurance, two of which were in the Bankers' Life Association of Iowa, each for $2,000, payable to his daughter as beneficiary. The controversy here arises over one of these policies. On the 22d day of September, 1905, he assigned one of the policies, No. 69,356, to his wife, now complainant's ward. The insurance company consented to this change of beneficiaries. On the day after his return from taking his wife to the Pontiac Asylum, viz., February 1st, he revoked this assignment and designated the defendant Mabel as his beneficiary instead of his wife to the amount of $1,800, and the balance, $200, to Ella Cole, his niece. This designation was also consented to by the insurance company.

The object of the bill of complaint in this cause is to set aside the transfer of this policy to his daughter, and to direct the payment thereof to the complainant for the benefit of his ward.

The grounds for the relief asked are:

(1) That said deceased was at the time incompetent to make such transfer.

(2) That it was obtained by undue influence on the part of his daughter.

(3) That it was in fraud of the rights of his wife.

Upon the hearing it was established by the evidence on the part of defendants that Mrs. Cole made a parol antenuptial agreement by which she was to be made the beneficiary in this policy of insurance, and Mrs. Cole was to make a will devising what property she had to her husband. He executed the transfer of the policy, but she had not made the will. She had never refused to make it, but deferred it, saying that he would have all her property at her death; that before she was taken to the hospital in Bay City she offered to carry out her agreement, but he refused on account of her mental condition. Three or four days before Mr. Cole died he executed papers transferring all his property to the defendant Mabel, including cash $500. Mr. Cole was affected with Bright's disease and heart disease for some time before he died. He was at times very much depressed in mind, and became despondent over his financial troubles and health; and at times his conduct was not normal, and was such as might lead to the inference that at periods he was not competent to attend to business affairs.

The bill also sought to set aside the other transfers of property, as above stated. That issue was evidently decided by the court below against complainant, as the transfers then made are not mentioned in the decree. The decree set aside the transfer of the policy of insurance as to the $1,800 provided therein to be paid to defendant Mabel, and authorized the complainant to receive and collect the same. The defendants alone have appealed.

GRANT, J. (after stating the facts). 1. The record in this case was made by a copy of the stenographer's minutes of the testimony taken in open court, including all the colloquies between counsel and the court, and attaching to it the certificate of the judge. Such testimony makes a record of more than 200 pages. The issues in-

volved require an examination of all the testimony. A record thus made up for a chancery appeal to this court is very easy for counsel and the trial court, but it imposes a needless amount of labor upon the appellate court. The statute (3 Comp. Laws, § 10188) provides for settling a case—

"Setting forth in substance all the evidence taken or read at the hearing, following as far as practicable the making of cases for review at law before the judge who tried the same, at such time and in such manner as is now provided by rule for the settlement of bills of exceptions in cases at law."

Following this statute, this record could easily have been condensed into one-third its present size with a saving of labor to the appellate court and expense to litigants. This practice in making up records is to be condemned. There is no occasion for making up a record of questions and answers except where, in the opinion of the trial court, it is essential for a proper understanding of the evidence, and to show the manner of eliciting the testimony.

2. As above stated, we assume that the trial court held that the complainant had failed to establish a case of incompetency in Mr. Cole to execute the transfer of the policy. He took the policy of insurance to his attorney, Mr. Shepard, who is the solicitor for the defendants in this case and their witness also, and told him what he wanted to do. According to this witness, he desired to make the change because he did not want the money to "go into the control of the Kelleys and her." The witness testified that Mr. Cole further said that, "He didn't want them (the Kelleys) to have any of it, neither did his wife." He seemed to understand and fully comprehend what he was doing. Without extending the evidence, we are constrained to hold that Mr. Cole was not at that time incompetent to execute the paper.

3. The question of undue influence rests upon a different basis. We said in *Rivard* v. *Rivard*, 109 Mich. 98 (66 N. W. 681, 63 Am. St. Rep. 566):

"Undue influence is not exercised openly. Like crime, it seeks secrecy in which to accomplish its poisonous work. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control."

Tested by this rule, it is quite apparent that some influence must have induced Mr. Cole not to leave his wife, who was then confined in an insane asylum, a dollar of his property for her support. His only child was married, and, so far as this record shows, to one who was able, and whose duty it was, to support her and who was supporting her. Mr. Cole was under no legal obligation to her. He was under both a legal and moral obligation to provide for his wife. He, however, attempted, not only to deprive her of any interest in his property, but also to impose upon her small estate the cost of her support in the hospitals and asylums, an expense which the law imposed upon him. Such conduct is unnatural. Mr. Cole, then about 58 years of age, was enfeebled by long continued and severe disease. His legs were swollen by the malady from which he was suffering. He was away from the influence of his wife. His constant companions were his daughter and her husband. He died a little over a month after the change in the policy was made. The relations between him and his wife had always been pleasant. There is no evidence of any unkind words or ill feeling between them. Under these circumstances, clearly some improper influence must have operated on him. No other influence can be suggested than that of his daughter or her husband, or both, who had the opportunity to influence him to take the action he did. If such a case were submitted to a jury, and they should find a verdict of undue influence, the courts would not set it aside. Whether the circuit judge so found or not we do not know. We think the circumstances are sufficient to justify a finding of undue influence, and we so hold.

4. The antenuptial agreement, though resting in parol, was valid, having been executed by Mr. Cole, and his wife having tendered him the execution upon her part. *Phillips* v. *Phillips*, 83 Mich. 259 (47 N. W. 110). In that case the agreement rested in parol, the husband agreeing to convey to his wife by deed a piece of land, she agreeing to give him back a life lease. He executed the deed to her. She, contrary to the case now before us, refused to execute the contract. He then filed a bill to set aside the deed. The court affirmed the transaction, refused to set aside the deed, and compelled her to execute the life lease. See, also, *Manke* v. *Manke*, 75 Mich. 435 (42 N. W. 958); *Houghton* v. *Houghton*, 14 Ind. 505 (77 Am. Dec. 69). The excuse given by him that he declined to accept the will because of her supposed mental condition, and because he did not want the property to go to her relatives, is not valid. When he made the contract, he knew that, if executed, the policy passed irrevocably to her, and that, if she performed her part by executing the will, his death before hers would cause a lapse of the legacy. Rood on Wills, § 668. She had never refused to execute a will, had always expressed a willingness to do so, but had delayed doing it. When she offered to execute it, she had not been found to be insane by anyone, and had not even been sent to the hospital in Bay City for treatment. There is no evidence of her incompetency to make a will. On the contrary, there was probative evidence that she was competent. Mr. Lavery testified:

"*Q.* When did you first notice anything peculiar on her part that looked as though she were crazy?
"*A.* That was a short few days possibly before the doctors examined her."

Not only by virtue of her marriage, but by virtue of his guardianship, Mr. Cole occupied the position of a most sacred trust towards his wife. It did not lie in his mouth

or power to annul a contract executed by him, and ready to be executed by her, by which he had agreed to transfer to her the policy in question.

The decree is affirmed, with costs.

BLAIR, C. J., and MOORE, McALVAY, and BROOKE, JJ., concurred.