MOORE *v.* BEECHER.

GIFTS—INTER VIVOS—EVIDENCE.

> Instrument whereby a widow, the mother of six adult children, purported to sell all of her property to three of them for a consideration consisting of (1) a nominal sum from each of them and (2) the placement of a sum of money, the amount to be determined later, in such a manner as to insure her living the rest of her life in the way she had been accustomed to live *held,* not to constitute a gift *inter vivos.*

Appeal from Wayne; Miller (Guy A.), J. Submitted April 8, 1936. (Docket No. 28, Calendar No. 38,717.) Decided November 10, 1936.

Bill by Grace Beecher Moore, William R., and George A. Beecher against Charles H., Frederick S., Frank E., and Fannie I. Beecher, Detroit Trust Company and Ralph D. Dieterle for an injunction, an accounting and other relief. Cross-bill by defendants Charles H., Frederick S., and Frank E. Beecher against plaintiffs and defendants Detroit Trust Company and Dieterle to enforce a written instrument signed by defendant Fannie I. Beecher, now deceased. Bill and cross-bill dismissed. Cross-plaintiffs appeal. Affirmed.

*Wm. Henry Gallagher,* for cross-plaintiffs.

*Yerkes, Goddard & McClintock* (*James I. McClintock* and *Frank W. Donovan,* of counsel), for cross-defendants.

SHARPE, J.  This is a suit to specifically enforce the provisions of the following instrument executed by Mrs. Fannie I. Beecher on March 21, 1934:

"Seward Hotel
March 21, 1934.

"During the month of December, 1933, my sons, George and Will, and my daughter, Grace, caused me untold worry and discomfort by their threats and intimidation. They threatened to have me declared incompetent, and have themselves appointed my guardian, unless I complied with their unreasonable demands, one of which was signing a blank check.

"In spite of all the trouble they caused me, I was still being fair to them, so made what in my judgment and also the judgment of my attorney was an equal distribution of property up to the amount of $75,000.

"Still unsatisfied Grace and Will came to my home this morning, and in the presence of witnesses used profane language and threatened me.

"Will made the threat he would enter my home when he wished, even though he had to break a window to do so, declaring he would club any one to death that interfered with his entering.

"Fearing to remain longer in my own home under existing conditions, I came to the Seward Hotel today under an assumed name.

"Believing my property is causing all of my trouble, I wish to dispose of it, and all of my responsibility, so I may continue my life in peace.

"Therefore, I do this day, March 21, 1934, sell to my sons, Charles H., Frank E., and Fred S. Beecher, all of my properties in any form, be it moneys, real estate bonds or securities, for the sum of $1 each and other valuable considerations, one of which is the agreement to divide said property in three equal parts and place a sum of money, the amount to be determined later, in such a manner as to insure my

living the rest of my life in the way I have been accustomed to live.

Fannie Isabella Beecher.

"Witness:

"Alma Witter."

Fannie I. Beecher is the widow of George L. Beecher who died in 1926 leaving a substantial estate, the larger part of which was received by the widow. There were also six children, the oldest of which was Charles and all being past 40 years of age at the time of the present action. For more than 20 years Charles had been a resident of Colorado and had not seen his mother from 1918 to 1931; Frank Beecher had no particular occupation and lived in Florida, Chicago, and during the spring of 1932 lived a few weeks in Detroit; George Beecher is married and lives in Birmingham, Michigan; Grace Beecher Moore married a resident of London, England, about 1897. Mrs. Beecher visited Grace in London in 1928 and Grace visited her mother in 1930 and 1932; Fred Beecher is unmarried and since his father's death resided with his mother until October, 1933. He was somewhat addicted to the use of liquor, was not gainfully employed and from his father's death to February, 1934, had received advances from his mother in excess of $70,000; Will Beecher lived in Detroit and in later years occupied a house next door to his mother.

Shortly after the death of Mr. Beecher, Mrs. Beecher allowed her children to share the benefits of her property and from time to time made advances to them. In 1928, she equalized all previous advances by distributing to each sufficient to bring his advances to $12,500 and on March 4, 1931, she directed the Detroit Trust Company to pay each child

$250 monthly. These payments continued until the spring of 1933.

On March 28, 1933, Mrs. Beecher instructed the trust company to make investments of funds or the sale of securities only upon the written consent of four of her six children. The letter also provided that no change was to be made in these instructions without the consent of all children. During this period it appeared to have been the intention of Mrs. Beecher to treat all of her children alike; this is evidenced by the contents of several wills and codicils executed by her. On March 9, 1928, Mrs. Beecher made a will bequeathing the bulk of her property in trust for the equal benefit of her children. March 17, 1931, this will was revoked and a new one executed but also contained the provision that each of her children should share equally. On December 13, 1933, a codicil was executed to the foregoing will revoking four bequests contained in said will but retaining the provision for an equal distribution to her said children. About this time jealousies over the prospective share that each child might receive out of the mother's estate began to appear, the result of which was that Charles, Frank, and Fred aligned themselves together in opposition to the remaining three children. However, in January, 1934, Mrs. Beecher executed another codicil to her will creating special legacies of $7,500 each to Charles, Frank, and Fred. It also appears that all of the children were in accord with the view that the relatives living in the east should not share in the estate to anything more than a nominal amount, and five of the children had a suspicion that Fred was getting more material benefits from the mother than any of the other children. This situation resulted

in Grace telling her mother that Fred must leave the home or she would; Fred left.

Prior to December, 1933, the trust company carried two accounts for Mrs. Beecher; one account consisted of properties that she derived from her husband's estate, while the other account consisted of properties which did not come from her husband's estate but from her family and other sources. A letter dated December 5, 1933, but signed on December 7, 1933, was drafted for her with instructions to the trust company to consolidate the two accounts and provided that $150 per month be paid Mrs. Beecher for spending money and recited her intention of dividing her property equally among her six children. A check was signed in blank payable to the Detroit Trust Company. Much persuasion was used by George to induce his mother to sign the check and letter of instructions. The following day Mrs. Beecher stopped payment on the check and told her chauffeur to wire Charles and have Fred call Frank who at that time was living in Florida. On December 12th, all of the children called at the mother's home for the purpose of discussing the letter of December 5th, the result of which was that a change was made among other matters by reducing the mother's spending allowance to $100 per month.

On or about December 28, 1933, Mrs. Beecher went to the Detroit Trust Company and attempted to revoke the arrangement of December 13th, but none of the children consented to any change. By March 15, 1934, the major portions of the distribution of the $75,000 to each child was completed with the exception of a dispute with Will over an item involving about $1,200 or $1,400 and a dispute with Grace concerning a necklace of the value of $2,900 for which Mrs. Beecher was going to charge Grace $20,000.

On March 20, 1934, an interview was arranged between Grace, Mrs. Beecher and Mr. Dieterle, an attorney who was representing Mrs. Beecher, the result of which was that Mrs. Beecher agreed to take back the necklace and replace it with securities. On March 21, 1934, Mr. Dieterle returned to the Beecher home and present upon this occasion were Charles, Will and Grace and after a furious quarrel the mother again determined to charge Grace with $20,000 for the necklace in question. Prior to this date some talk had been had and steps taken to have a guardian appointed for Mrs. Beecher. Following the quarrel Mrs. Beecher went to the Seward Hotel in Detroit in order to avoid the service of process of the contemplated guardianship proceedings and while at the hotel she signed the instrument involved in these proceedings. On March 23, 1934, the Detroit Trust Company and Dieterle were served with an injunction in the present case and Mrs. Beecher's appearance was entered by Dieterle. Mrs. Beecher's affairs were still handled by the Detroit Trust Company. Mrs. Beecher died April 19, 1934. Her will was offered for probate by the Detroit Trust Company and all children signed consents to the reduction of the special administrator's bond. The will was admitted to probate and when the chancery case was called for hearing plaintiffs abandoned their bill of complaint and the case proceeded upon defendants' cross-bill which asks for specific performance of the instrument dated March 21, 1934. The trial judge held that the instrument had been procured through undue influence and dismissed defendants' cross-bill. Defendants Charles, Frank and Frederick Beecher appeal.

It is appellants' contention that this operated as a present conveyance upon condition subsequent; that the condition was not complied with through

operation of law, by the issuance of the injunction in the instant case; that such injunction executed the full performance of the condition; that the purpose of the condition—the maintenance of the mother in her accustomed manner—was fulfilled; and that upon the mother's death full title vested in the three grantees.

Appellees contend that the writing in question did not transfer any property to appellants and that appellants did not sustain the burden of showing want of undue influence. We have carefully examined the record and agree with the trial judge that Mrs. Beecher was mentally competent to execute a will on February 14, 1934.

We now come to the problem of an interpretation of the instrument in question and in construing an instrument it must be read in the light of the surrounding circumstances to determine the intent of the maker. The intent determines whether the condition is precedent or subsequent. *DeConick* v. *DeConick*, 154 Mich. 187 (22 L. R. A. [N. S.] 417). The transaction cannot be sustained as a gift. If it is a gift there must be an intent by the grantor to presently divest himself of title to and dominion over the subject of the gift. *Chamberlain* v. *Eddy*, 154 Mich. 593. Moreover, such intent must be clear. *Campbell* v. *Sech*, 155 Mich. 634.

In *Snyder* v. *Snyder*, 131 Mich. 658, it was stated as follows:

"To constitute a valid gift *inter vivos*, it must take effect at once, and pass entirely beyond the control of the donor. The retaining of any control in the hands of the donor over the subject of the gift renders it invalid. Thornton Gifts and Advancements, § 76; *Holmes* v. *McDonald*, 119 Mich. 563 (75 Am. St. Rep. 430), where we held that the *jus disponendi*

must be placed beyond the power of the donor to recall. See, also, 14 A. & E. Encyc. Law (2d Ed.), 1014 *et seq.* Under defendant Thomas' own statement in his answer, his mother retained the entire control over this gift, and had the right to retain as her own all sums that Benjamin paid to her or to Thomas during her lifetime. She could collect and use the entire amount. It follows that this assignment must be held void.''

And in *Chaddock* v. *Chaddock,* 134 Mich. 48, it was said:

''To effectuate a gift *inter vivos,* there must be an unconditional delivery, either to the donee direct or to some one for him, and the right of disposition must be wholly beyond the power of the donor. *Holmes* v. *McDonald,* 119 Mich. 563 (75 Am. St. Rep. 430); *Burns* v. *Burns,* 132 Mich. 441; *Snyder* v. *Snyder,* 131 Mich. 658; 14 A. & E. Encyc. Law (2d Ed.), 1014. The evidence in this case entirely fails to show such a gift.''

See, also, *Holmes* v. *McDonald,* 119 Mich. 563 (75 Am. St. Rep. 430); *Shepard* v. *Shepard,* 164 Mich. 183.

Moreover, the subsequent conduct of Mrs. Beecher and appellants strongly indicates that neither Mrs. Beecher nor appellants regarded the instrument as having passed any title whatsoever. Following March 21st and until the date of her death, April 19, 1934, Mr. O'Donnell, of the trust company, saw Mrs. Beecher several times and O'Donnell saw Frank and Charles but no claim was ever made by Frank, Charles, Fred or Mrs. Beecher between March 21st and the date of her death that she had transferred any part of her estate nor was any mention ever made of the instrument. The customary weekly payments by the Detroit Trust Company to Mrs.

Beecher's maid and chauffeur were continued until her death. All of Mrs. Beecher's household expenses were paid by the Detroit Trust Company until the date of her death. On March 22, 1934, Mrs. Beecher obtained $105 from the Detroit Trust Company to pay rent for her apartment at the Seward. On April 5th she received her usual $100 per month remittance. She indorsed her approval upon a bill to her from the Detroit Automobile Club for insurance on her car; this bill was paid by the Detroit Trust Company pursuant to Mrs. Beecher's okay. Previous to April 9th, she conferred with Mr. O'Donnell as to what the gift tax was going to amount to on the distributions she had made to all of her children, and on that date instructed the Detroit Trust Company in writing to prepare a memorandum showing the approximate gift tax—"that I will have to pay upon the recent distribution of cash and securities that I made to all of my children." On April 9th, she likewise, in writing, instructed the Detroit Trust Company to pay William Beecher $1,279.57 as an additional gift. The night of Mrs. Beecher's death, Charles called O'Donnell and asked him to have someone take charge of the house and its contents and on the following morning Charles went to the trust company and was anxious to have someone take charge of the premises. He left the keys to the house with the trust company and signed a petition for probate of Mrs. Beecher's will and for special administration.

In *Shepard* v. *Shepard, supra,* 199, the value and force of conduct in determining intent is recognized in this language:

"In weighing questions of this nature, we must often place more dependence upon the conduct and action of parties, than upon the testimony of wit-

nesses, as to transactions long passed. While it is true that the crucial point in the case is as to the intent and conduct of David Shepard, much also depends upon the conduct of the parties to this suit, where the rules of evidence relating to estoppels and admissions should be applied with their usual force."

See, also, *Ladensack* v. *Johnson,* 143 Mich. 535; *Kimball* v. *Batley,* 174 Mich. 544; *Kraus* v. *Vandevanter,* 237 Mich. 168.

We think there can be no question of the failure of appellants to establish that Mrs. Beecher intended to part with title to her property or relinquish control over it.

It is contended that the relationship between Frank and Charles with their mother from December 12, 1933, down to the date of her death was in the nature of a fiduciary relationship. We think there is much merit in this contention. The record shows that when Mrs. Beecher visited the trust company she was invariably accompanied by either Charles or Frank and sometimes by both sons and upon many occasions these sons participated in the discussions with their mother and the officers or agents of the trust company. Both Charles and Frank were with their mother on January 25, 1934, when she executed the codicil to her will; the meeting between Grace and her mother was arranged through Charles, the dealings that Dieterle had with Mrs. Beecher were usually arranged with Charles; the fixing of Dieterle's fee in connection with the distribution was a matter that was taken up with Charles; the insistence of Charles that his mother charge Grace $20,000 for a necklace worth not more than $3,000; the fact that Charles lived at his mother's home continuously from December 10, 1933, to

March 15, 1934, and his daily presence there until his mother's death gave him the opportunity to prevent other members of the family from seeing their mother. The acts of Charles and Frank against their mother who was 80 years old, suffering from a stomach disorder, frequently confined to her bed and unable to eat and who eventually died of cancer created a relationship of such a nature as to raise the inference of undue influence.

In *Andrews* v. *Lavery*, 159 Mich. 26, 31, the court said:

"The question of undue influence rests upon a different basis. We said in *Rivard* v. *Rivard,* 109 Mich. 98 (63 Am. St. Rep. 566):

"'Undue influence is not exercised openly. Like crime, it seeks secrecy in which to accomplish its poisonous work. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control.'"

See, also, *Snyder* v. *Snyder, supra; Thon* v. *Stiles,* 259 Mich. 145.

In our view of the proceedings the appellants have not sustained the burden of showing the elements necessary to a gift *inter vivos*. The decree of the lower court is affirmed. Appellees may recover costs.

Toy, J. concurred with Sharpe, J.

Wiest, J. I concur in the result.

There was no gift *inter vivos* and, therefore, it is wholly unnecessary to consider the question of undue influence in procuring the writing claimed to constitute such a gift.

North, C. J., and Fead, Butzel and Bushnell, JJ., concurred with Wiest, J.

Potter, J., took no part in this decision.