SHEPARD *v.* SHEPARD.

1. WITNESSES — COMPETENCY — MATTERS   EQUALLY   WITHIN KNOWLEDGE OF DECEASED.
   In a suit to obtain an accounting of securities given by a decedent to defendant, in which complainant claimed rights by virtue of a prior gift from deceased, his father, testimony of both parties relating to matters equally within the knowledge of deceased was incompetent.

2. JUDGMENT—RES JUDICATA—GIFTS.
   The judgment of the Supreme Court, in a case involving the mental competency of deceased to execute a will, and alleged undue influence of defendant in securing its execution (*In re Shepard's Estate,* 161 Mich. 441 [126 N. W. 640] ), is not *res judicata* of the question whether valid gifts were made by testator to his sons of securities claimed by defendant to have been transferred as a revocable, testamentary disposition.

3. GIFTS—EXECUTION—DELIVERY.
   A gift *inter vivos,* to be valid, requires a gratuitous and abso-

lute transfer of the property from the donor to the donee, taking effect immediately; and fully executed by the delivery of the property by the donor, and an acceptance thereof by the donee: there must be an absolute delivery with the intention of making a gift and passing title; and the delivery must be according to the nature of the property.

4. SAME—CHOSE IN ACTION—ASSIGNMENT.

In the case of a gift of a chose in action, the law requires a written assignment, or some equivalent instrument to effect the transfer.

5. SAME.

Delivery of a written assignment of a chose in action is a good delivery of the property.

6. SAME—DELIVERY.

Where donor and donee reside together, as in the case of husband and wife, or parent and child, it is not required that the thing given should be removed from the common residence.

7. SAME—TRUSTS—PERSONAL PROPERTY.

Under some circumstances the donor may constitute himself a trustee for the donee, and in such case no further delivery is necessary.

8. SAME—EXECUTION—POSSESSION.

Although delivery is essential to perfect the gift, the donee is not required to retain possession of the property, and while the subsequent possession by the donor may, in some cases, tend to throw suspicion on the transaction as being in fraud of creditors, it is not necessarily incompatible with the donee's dominion over the property, and, if satisfactorily explained, will not divest the donee of title.

9. SAME—USE BY DONOR—POSSESSION.

Nor is a gift necessarily defeated because the donor reserved to himself the use or income from the subject-matter of the gift.

10. SAME—PARENT AND CHILD.

Where a father delivered securities to his sons, who placed marks upon them, and the parties dealt for some years with the property as belonging to the sons, who left the gifts in the safe of the donor, to which both had full access, a completed gift of the property was executed.

11. SAME—EVIDENCE.

That the parent credited his sons with interest on notes re-

maining in his possession, or that the notes were taken in the names of the sons, or indorsed to them, is not sufficient evidence of a delivery of the instruments.

Appeal from Calhoun; North, J. Submitted November 15, 1910. (Docket No. 36.) Decided December 30, 1910. Rehearing denied April 1, 1911.

Bill by Alfred Shepard against Freedom G. Shepard for an accounting. From a decree for complainant, defendant appeals. Modified and affirmed.

*Arthur B. Williams* (*Harrison Geer*, of counsel), for complainant.

*George W. Mechem, Dallas Boudeman,* and *Bernard J. Onen,* for defendant.

STONE, J. The bill of complaint in this case was filed to obtain an accounting on the part of the defendant with respect to certain mortgages, promissory notes, stocks, and other securities, and the renewals thereof, and the income therefrom. The complainant and defendant are brothers, and are the only children of David Shepard, deceased. This court, in the case *In re Shepard's Estate,* 161 Mich. 441 (126 N. W. 640), passed upon the proceeding to probate the will of David Shepard, in which proceeding the defendant was the proponent, and the complainant the contestant of said will. The issue in that case was the mental competency of David Shepard, and whether he had been unduly influenced by the defendant in the making of said will. We may, from time to time, refer to that case, as it contains copies of certain documents which we may not find it necessary to insert here.

It is the claim of the complainant that the securities above referred to were given to him and to his brother, the defendant, at different times before the death of David Shepard, or that they were given to the two sons jointly, and that David Shepard afterwards, in the month of August, 1902, attempted to give these same securities to the

defendant, which securities are now largely in defendant's possession. We shall not even state the substance of the lengthy pleadings in this case, but it is sufficient to say that the essential facts with respect to the question, whether these alleged gifts were made as claimed by the complainant, are sufficiently set forth in the bill, and are answered by the defendant.

Under the issue made by the pleadings, the question for this court to determine is, whether there were gifts *inter vivos* and a sufficient delivery, with the intent on the part of David Shepard to give these securities to the complainant. If there was such a delivery intending to vest title *in præsenti*, then there were gifts on these occasions, otherwise not.

The record in the will case, comprising some five large volumes and an index, has been stipulated as a part of the record in this case, and, with an additional volume containing the pleadings and additional evidence, they comprise the printed record in this case.

Some matters in the case are not controverted, and among them are the following: David Shepard died March 16, 1904, at the age of 83 years. His wife died in 1898. He was survived by two sons, Alfred and Freedom, the parties to this suit, then aged respectively about 62 and 59 years of age, each of whom was married and had one daughter. David Shepard had a long, active, and honorable business career as a manufacturer, being connected with the Nichols & Shepard Co., of Battle Creek, and other business enterprises. About 1880 he withdrew from an active part in the business of the said company (which business was then carried on by the older corporation of Nichols, Shepard & Co.), although he retained a passive connection with that company as a stockholder, director, and officer. Thereafter he devoted himself principally to the business of investing his money in various loans, bonds, and stocks. In the course of his career, he accumulated a considerable fortune. From time to time he made gifts to his two sons, to their wives, and to

their daughters.    Invariably, when he made a gift to one son, his wife, or daughter, he made a like gift to the other son, his wife, or daughter.    These gifts, whatever they may have been, down to August, 1902, had been characterized by the most scrupulous impartiality, it apparently being his settled purpose during that period to treat these parties absolutely alike.    The largest gifts which he made them, prior to the alleged gifts in question in this suit, were in 1890.    He then gave complainant and defendant securities and other property amounting to over $60,000 each, and it is claimed that he gave them jointly securities and other property amounting to over $150,000.    We shall have occasion to refer later to certain of the securities included in these gifts of 1890.

The first real controversy in this case has to do with the alleged gifts of 1896.    It is the claim of the complainant that on this occasion his father, David Shepard, gave to him bonds and mortgages amounting to $56,858.42, and that on the same occasion he gave to the defendant bonds and mortgages amounting to $56,848.71, a check for $9.71 being given by the complainant to the defendant with the object of making the gifts equal, and that on the same occasion he gave to them jointly mortgages and notes and certain bond coupons amounting to $21,415.05.    The defendant admits that on this occasion David Shepard " made ostensible transfers " of these securities as claimed by complainant, but denies that there was a completed and absolute gift.

Entertaining the views which we do respecting the admissibility of certain testimony of the parties in this suit (all of which seems to have been considered by the circuit judge), we find it somewhat difficult to even make a statement of the matters in evidence in the case.    However, we may say that it appears that the matter of this transaction was under consideration by David Shepard and the sons for a considerable time before it was finally consummated.    There was a great number of securities, and it is undisputed that they were all figured up and adjusted as

to their value as of January 1, 1897, and lists of those that were to go respectively to the complainant and defendant, and to them jointly, were made. Some of the securities were assigned by simple indorsements, and as to some there were formal assignments. The complainant and defendant prepared the formal assignments, which were duly executed by David Shepard. At this time the defendant resided in Battle Creek, and near his father's home. The complainant lived elsewhere, but for many years there had been a family gathering at David Shepard's home near the Christmas season of each year. On this occasion Mr. Fred M. Wadleigh, an attorney, was called in to act merely as a notary public, and he took David Shepard's acknowledgments to the assignments of the securities that required formal assignment. These assignments were signed by David Shepard on December 29, 1896.

Up to this point there is no substantial dispute between the parties as to what was done. The complainant, however, claims that the securities indorsed and assigned to him were placed in one basket, and those which were indorsed and assigned to the defendant were placed in another basket, and that the respective baskets were handed, one to complainant, and one to defendant, by David Shepard, who said: "I give these to you," and, "I give these to you." The wife of complainant testified that she placed her initials on some of the papers at the request of the parties; that Fannie L. Shepard, the wife of defendant, also, at a like request, placed her initials on some of the papers referred to. It is also the claim of complainant that the formal assignments which had been acknowledged, as we have stated, by David Shepard, were taken away by the complainant and the defendant, each taking those which were assigned to him, respectively. It may as well be stated here that the defendant denies that there was any such formal delivery, or the use of baskets, as is claimed by the complainant, and in this he is corroborated by his wife, Fan-

nie L. Shepard. It is undisputed that the securities themselves were put back into the safe of David Shepard, in his house, but that all of the parties, including David Shepard, had equal access to this safe, at all times, for years thereafter. It is pertinent to say that on or about the 29th of December, 1896, a contract was made and executed by and between the complainant and the defendant, which provided for the adjustment between them of interest, expenses, and losses, in connection with these securities, with the evident purpose of making the amounts that should be realized upon the alleged gifts to them absolutely equal. This contract commences as follows:

"Whereas, our father, David Shepard, has assigned and delivered to each of us a large amount of personal property consisting of notes, mortgages, bonds, trust deeds, stocks, and other evidence of indebtedness, and it being his intention to divide the whole amount equally between us," etc.

This contract was signed by the complainant and defendant only.

Certain letters referred to in the opinion of the court in *Re Shepard's Estate, supra*, were written by complainant to defendant, and to David Shepard, which we shall have occasion to refer to later.

It is the claim of the complainant that it was agreed that David Shepard should look after the securities for the complainant and the defendant, and it is significant that for years all the parties had access to, and had more or less to do with the handling of, these securities; it being the claim of the defendant that David Shepard was handling them for himself; and this becomes a somewhat important question in the case. It appears to be undisputed that these securities were entered in a new book called "Bills Receivable," under different headings, those entered as belonging to complainant in one list, and those headed as belonging to the defendant in another list. This book was left with David Shepard, and entries were

made in it, from time to time, by him, indicating payments that were made, either on principal or interest, with date and amount. We think that it is really undisputed that, in accordance with the contract between the parties above referred to, yearly settlements were made between the complainant and defendant during the Christmas season, and that David Shepard accounted to these parties for his handling of these securities. Statements showing the amount collected, the amount of interest paid, and any reinvestment by David Shepard, were prepared. This appears in settlement sheets for the years 1897 and 1898, and following years, until a disagreement occurred between the brothers, the parties hereto. For instance, at the settlement at Christmas time, 1897, as shown by recapitulation in evidence, it was found that, including their respective individual and joint matters, David Shepard had collected for Alfred, or on Alfred's list, $12,980.33, and for Freedom, or on Freedom's list, $12,071.97; that David Shepard had made reinvestments for complainant of $2,425, and for defendant $2,512, which it is claimed were turned over to them, and were left with David the same as the other securities. It appears from this statement that David Shepard paid complainant $9,575.73, by turning over to him certain certificates of deposit aggregating that amount; and that he paid to defendant, by turning over to him certificates of deposit for $7,514.14 and a check for $1,045.83. The settlement sheets show that each of the parties hereto allowed to David Shepard $1,000, which was entered as salary.

It would further appear by the exhibits that by taking certificates of deposit in odd amounts, as above stated, complainant was overpaid to the extent of $20.40, and that he gave a check to his father for that amount. There is no evidence in the record of any prior agreement to pay David Shepard a salary, but it is not disputed that such salary was entered and allowed to him for that year.

The documentary evidence further shows that at the

settlement at Christmas time, 1898, it was found that David Shepard had collected $14,234.65 for complainant, and $12,057.40 for defendant. That complainant was paid $11,683.85 in certificates of deposit, and the check of David Shepard for $10.85, and was given one-half of the reinvestments for that year, or $2,500. There was turned over to the defendant the other one-half of the reinvestments, of $2,500, and the balance was paid to him in certificates of deposit or checks, which amounted to $98.20 more than he was entitled to by virtue of collections made for him by the father, and to make it correct he gave back to his father a check for that amount. Nothing appears to have been allowed David Shepard for salary at this settlement.

At the settlement of Christmas time, 1899, the documentary evidence shows that it was found that David Shepard had collected for complainant $15,084.04, and for defendant $14,375.08, or $708.95 more for complainant than for defendant. An examination of the exhibits indicates that all the moneys collected for the two sons that year had been put into new loans or reinvestments, and by the entries would seem to have been accepted by the sons in lieu of cash, and were scheduled upon their settlement sheets for that year as belonging to the joint account of A. & F. G. Shepard. These appeared for the first time on settlement sheets, these loans which, according to the entries, had been made for the joint account during the year covered by that settlement. These new loans had been placed in the "Bills Receivable" book. They were taken in the name of either complainant or defendant, or David Shepard, as the case might be, and apparently without regard to the matter of ownership; the loans all being scheduled and accounted for as belonging to the joint account. David Shepard seems to have given the complainant a draft for $708.96 to balance the account.

At the attempted and uncompleted settlement at Christmas, 1900, occurred some trouble between the brothers

over what is termed in this record the "Hofer loan," which we shall hereafter refer to, and after which time no further settlements were had. The documentary evidence indicates that it had been David Shepard's custom to make yearly inventories of his property. There were two inventories under date of January 1, 1897. The first includes the property which, it is claimed, was given to the complainant and defendant at the Christmas season of 1896, and which appears to have been initialed to the complainant and defendant. The total was $213,392.58.

After the alleged gift was made, another inventory, under date of January 1, 1897, was made, which did not include the securities claimed to have been given to the complainant and defendant, and they are not included in the subsequent inventories. It will be noted from the second inventory, above referred to, that after the claimed gift of December, 1896, David Shepard had property left of the value of $67,838.46, besides accrued interest, and besides the homestead, which was not listed. The matter of inventories made by David Shepard in his name is somewhat confusing. As we have already indicated, part of the entries in these books, after the alleged gifts, with reference to these securities, were made by David Shepard, and part of them by the complainant, and a part by the defendant. This is significant as showing that David Shepard knew of the manner in which the books were kept. We cannot in this opinion attempt to refer to all the numerous exhibits which appear in this record, and which have been examined by us. Defendant's letter to complainant January 5, 1898, relating to excess interest and commissions, shows his understanding of matters.

There seems to be little controversy about the nature of the transaction of 1900. On that occasion the brothers seem to have taken possession of the securities that were given to them, and to have carried the same away. This was not true, however, as to the Nichols & Shepard Co. note of $50,000. We do not understand that there is any

dispute that that note was given absolutely to the complainant and the defendant in 1890, but that for several years David Shepard was allowed to retain the interest from it, and the complainant gave defendant written authority to pay to David Shepard such part of the interest from this note as he might desire.

We come now to the claimed gift of 1899, involved in this suit. The complainant claims that on November 8, 1899, David Shepard made a gift and delivery to the defendant and himself jointly of 360 shares of stock in the Nichols & Shepard Co., of the par value of $9,000, but of the actual value of $27,000. Also of 100 shares of stock in the National Bank of Battle Creek, of the par value of $10,000, and of the actual value of that amount and upwards; and also of 25 shares of stock in the Merchants' Savings Bank of Battle Creek, of the par value of $2,500, but of the actual value of upwards of $3,750; and that at the same time David Shepard made a gift to complainant of 200 shares of the Nichols, Shepard & Co. stock (the old corporation), and to the defendant of 200 shares of that stock by executing and delivering to them assignments on the certificates therefor. The defendant admits that David Shepard indorsed assignments on the certificates for this stock, as alleged by complainant, but denies that David Shepard delivered them to the parties as claimed by the complainant. The certificates were put back in the safe with the other papers. The wives testified upon this subject, each corroborating her husband's claim. Photographic copies of these assignments appear in evidence.

This brings us to the Nichols & Shepard Co. notes for $16,000, $10,000, and $3,000, in which complainant claims one-half interest. He also claimed a one-half interest in a $5,000 Nichols & Shepard Co. note, but the circuit judge found against him in that, and as he has not appealed, we shall not refer further to that note. Complainant claims that at the Christmas season of 1900, Freedom said to

him: "Alf, father has given us all the notes, which takes about everything now." That the defendant and he then went into the sitting room where his father was, and that a certain conversation there occurred. Further testimony of the complainant upon this subject cannot be considered, for the reason which we shall hereafter state. The $16,000 loan appears to have been made in 1899, and was first evidenced by a note which was made payable to A. & F. G. Shepard. This note was renewed at least twice; both renewals being made payable to A. & F. G. Shepard. The $10,000 loan was evidenced by a note dated November 6, 1899, made payable to David Shepard, and was by him indorsed to A. & F. G. Shepard. This note was renewed probably twice, and first seems to have been made payable to David Shepard, and by him indorsed in blank; again renewed, payable to David Shepard, and indorsed to the defendant, and the notes seem to have remained with the other papers. The last indorsement was probably made in connection with the transaction of 1902. The $3,000 loan was evidenced by a note dated July 27, 1900, which was made payable to David Shepard, and was by him indorsed to A. & F. G. Shepard. This was renewed, probably twice; the renewals being payable to David Shepard. The first renewal seems to have been indorsed in blank, and the second renewal was indorsed to A. & F. G. Shepard. This note seems to have been in existence, having been renewed at about the time of the claimed gift of Freedom in August, 1902, and is indorsed to defendant.

The defendant denies absolutely the testimony of the complainant as to his statement of what David Shepard had said to him as to putting those notes on their lists. The notes appear to have been listed. The only interest payment on any of these notes that was turned over to complainant and defendant, so far as is traceable, is the interest on the $16,000 note, which came due December 20, 1900. That interest payment appears to have been entered in David Shepard's cash book, in his own hand-

writing, under date of December 24, 1900, and seems to have been initialed by him as belonging to "A. & F.," which would seem to mean Alfred and Freedom. This payment is then posted in his ledger, in his own handwriting, under date of December 21, 1900, to the credit of the account of A. & F. G. Shepard. The circuit judge seems to have had some difficulty in reaching a conclusion as to this matter, which will be referred to later.

The assignment to the defendant by David Shepard, bearing date August 2, 1902, and the extract from the will of David Shepard, which was made a few days later, appear in the opinion in *Re Shepard's Estate, supra,* and will not be repeated here.

There is also in controversy here a note for $10,386. This note grew out of stock earnings of the Nichols & Shepard Co. stock, included in the gift of 1890. That stock we do not understand to be in controversy here, but it appears that this $10,386 note grew principally out of the dividends on that stock. We do not understand that there is any question as to the ownership in complainant of the certificate of stock known as No. 3 for 1,833 shares of that stock. The complainant claims $3,-360 interest in the principal of this note, together with his proportion of the interest on his share of the same. Of the principal so claimed, $3,000 arises out of dividend No. 5, paid on or about April 16, 1901, and $360 arises out of dividend No. 6, paid on or about April 16, 1902. As we understand it, complainant received all of dividend No. 6 on certificate No. 3 (which belongs to him, it being the original certificate given to the two sons in November, 1890, the whole of such certificate No. 3 being assigned to the complainant when the stock dividend represented by certificate No. 26 was paid in 1891, defendant thereupon taking and holding certificate No. 26), but did not receive his one-half of dividend No. 6 on certificate No. 181, evidencing the $9,000 of Nichols & Shepard stock in controversy in this suit, the one-half of said dividend on certifi-

cate 181 being $360, the amount decreed to the complainant by the trial court, growing out of this dividend.

In the letter from the defendant to the complainant, bearing date January 11, 1904, the defendant said:

"I would also suggest that you have the Nichols & Shepard Co. stock issued direct to you, so that all future dividends may go direct to you. If you will tell me the date of the last dividend you have had, I will try to get them straightened out and sent you."

The "Hofer loan" of $17,000 was taken in the name of the complainant. The circuit judge found that the complainant owned in his own right nine-seventeenths of this loan. He also found and decreed that eight-seventeenths thereof belonged to the defendant out of money which he borrowed from his father, which was charged to him, and advanced to the complainant by defendant. We shall have occasion to speak of this later.

It is apparent that the principal questions in this case are whether the transactions of 1896 and of 1899, and with respect to the Nichols & Shepard Co. notes, constitute gifts *inter vivos*, as claimed by the complainant and found by the circuit judge; and it follows that the principal point to be considered in determining this question is, whether these gifts were consummated by delivery of the securities, with intent on the part of David Shepard to make them a then present gift. In determining this question we are met at the outset with the inquiry as to whether the testimony of the parties to this suit, or that of either of them, as to matters equally within the knowledge of David Shepard, is admissible under our statute.

Our statute, section 10212 (3 Comp. Laws), as amended by Act No. 30, Pub. Acts 1903, reads as follows:

"When a suit or proceeding is prosecuted or defended by the heirs, assigns, devisees, legatees or personal representatives of a deceased person, the opposite party, if examined as a witness on his own behalf, shall not be admitted to testify at all to matters which, if true, must have been equally within the knowledge of such deceased person.

\* \* \* *Provided,* that whenever the words ' the opposite party' occur in this section it shall be deemed to include the assignors or assignees of the claim, or any part thereof in controversy."

We have here a complainant claiming to be the assignee of his deceased father, prosecuting, and a defendant claiming by a later assignment from, and as sole legatee of, his deceased father, defending.   It seems clear to us that this suit cannot be maintained against the defendant, if it could not have been maintained against the father.   The defendant therefore stands in his father's shoes, in so far as this statute is concerned.   So we have here a case not only within the very letter, but within the whole spirit, of this statute.   The true test of every transaction in issue is the intent of David Shepard in the particular transaction. Alfred Shepard may have intended a full and completed gift.   Freedom G. Shepard may have intended a full and completed gift, but that will not avail complainant, unless David Shepard intended to part with dominion and control over the property.   Under the statute, the lips of David Shepard being sealed by death, it is very clear to us that the lips of complainant are sealed by law.   *Taylor* v. *Bunker,* 68 Mich. 258 (36 N. W. 66); *Schuffert* v. *Grote,* 88 Mich. 650 (50 N. W. 657, 26 Am. St. Rep. 316); *Lloyd* v. *Hollenback,* 98 Mich. 203 (57 N. W. 110); *O'Neil* v. *Greenwood,* 106 Mich. 572 (64 N. W. 511); *Harris* v. *Cable,* 113 Mich. 192 (71 N. W. 531); *Bailey* v. *Holden,* 113 Mich. 402 (71 N. W. 841); *Michels* v. *Underwriters' Ass'n,* 129 Mich. 417 (89 N. W. 56); *Sparling* v. *Smeltzer,* 133 Mich. 454 (95 N. W. 571); *Great Camp K. O. T. M.* v. *Savage,* 135 Mich. 459 (98 N. W. 26); *Campbell* v. *Sech,* 155 Mich. 634 (119 N. W. 922); *Beadle* v. *Anderson,* 158 Mich. 483 (123 N. W. 8); *Union Trust & Sav. Bank* v. *Tyler,* 161 Mich. 561 (126 N. W. 713); *Ripley* v. *Seligman,* 88 Mich. 177 (50 N. W. 143).

In the last-cited case, Justice CHAMPLIN, speaking for the majority of the court, used language which, in view

of our later amendments to this statute, has increased significance. He said:

"The word 'assigns' is used here in its legal sense, and signifies a person to whom any property or right is transferred by a deceased person in his lifetime. The statute is broad enough to cover successive transfers, or where the controversy depends upon the acts or dealings with the property of the deceased in his lifetime; and any one, who is called upon to prosecute or defend some interest which is affected by the act or agreement of the deceased party through whom he claims, may invoke the protection of the statute to shield his interest from the testimony of the opposite party to matters which, if true, were equally within the knowledge of the deceased person through whom he claims."

Under this statute, in our opinion, the testimony of the parties, complainant and defendant, is inadmissible as to transactions and communications with the common ancestor, or, in other words, which were equally within the knowledge of such deceased person; and the testimony of both these parties as to such matters must be eliminated in the consideration of this case.

In the consideration of this case, due weight should be given to the advantage which the circuit judge had in seeing and hearing the witnesses give their testimony in open court; and therefore his finding, under competent testimony, is entitled to due weight under our repeated decisions. This, however, does not relieve this court from the duty of the exercise of its own judgment in passing upon the questions involved in a case. The circuit judge found in favor of the complainant on substantially every proposition claimed by him. The defendant has appealed.

We shall not attempt to review the evidence in this case, covering as it does nearly 2,000 pages. We do not consider that the opinion of this court in the will case, where the issues were mental competency and undue influence, is *res adjudicata* of the questions here presented. *Reed* v. *Whipple*, 140 Mich. 7 (103 N. W. 548).

In this case much depends upon the conduct of the par-

ties, complainant and defendant, taken in connection with the conduct and acts of David Shepard. In weighing questions of this nature, we must often place more dependence upon the conduct and action of parties, than upon the testimony of witnesses, as to transactions long passed. While it is true that the crucial point in the case is as to the intent and conduct of David Shepard, much also depends upon the conduct of the parties to this suit, where the rules of evidence relating to estoppels and admissions should be applied with their usual force. Upon the question of gifts *inter vivos,* we have many decisions in this State. We refer to the following: *Love* v. *Francis,* 63 Mich. 181 (29 N. W. 843, 6 Am. St. Rep. 290); *O'Neil* v. *Greenwood, supra; Harris* v. *Cable, supra; Holmes* v. *McDonald,* 119 Mich. 563 (78 N. W. 647, 75 Am. St. Rep. 430); *Peninsular Sav. Bank* v. *Wineman,* 123 Mich. 257 (81 N. W. 1091); *Reed* v. *Whipple, supra; Snyder* v. *Snyder,* 131 Mich. 658 (92 N. W. 353); *Poppleton* v. *Poppleton,* 143 Mich. 208 (106 N. W. 703); *Bangs* v. *Browne,* 149 Mich. 478 (112 N. W. 1107); *State Bank of Croswell* v. *Johnson,* 151 Mich. 538 (115 N. W. 464); *Union Trust & Sav. Bank* v. *Tyler, supra.* We also refer to the following: *Tucker* v. *Tucker,* 138 Iowa, 344 (116 N. W. 119); *Candee* v. *Savings Bank,* 81 Conn. 372 (71 Atl. 551, 22 L. R. A. [N. S.] 568); *McNally* v. *McAndrew,* 98 Wis. 62 (73 N. W. 315); *Bone* v. *Holmes,* 195 Mass. 495 (81 N. E. 290); *Gannon* v. *McGuire,* 160 N. Y. 476 (55 N. E. 7, 73 Am. St. Rep. 694); *Beaumont* v. *Beaumont,* 152 Fed. 55, 81 C. C. A. 251; *James* v. *Aller,* 68 N. J. Eq. 666 (62 Atl. 427, 2 L. R. A. [N. S.] 285, 111 Am. St. Rep. 654, 6 Am. & Eng. Ann. Cas. 430); 14 Am. & Eng. Enc. Law (2d Ed.), p. 1014 *et seq.*

The authorities are agreed that, to constitute a valid gift *inter vivos,* there must be a gratuitous and absolute transfer of the property from the donor to the donee, taking effect immediately, and fully executed by the delivery of

the property by the donor, and an acceptance thereof by the donee.

As was said by the Supreme Court of Vermont in *Williamson* v. *Johnson*, 62 Vt. 378 (20 Atl. 279, 9 L. R. A. 277, 22 Am. St. Rep. 117):

"All the definitions come to this: That to constitute a valid gift it must be voluntary, gratuitous, and absolute."

All that is necessary to constitute a valid transfer of property by parol is an expression to that effect by the donor, accompanied by a delivery of the thing to the donee. This proposition seems to be well supported by authority, that no absolute rule can be laid down as to what will constitute a sufficient delivery to support a gift in all cases, for in each case the character of the delivery requisite to sustain the transaction as a gift will depend very largely upon the nature of the subject-matter of the gift, and the situation and circumstances of the parties. There are, however, certain well-settled general principles governing the question. Among them are the following: There must be an absolute delivery, with the intention of making a gift, and passing title. The delivery must be according to the nature of the property.

In accordance with the general rule, that delivery of the property is necessary to perfect a gift, the doctrine has been laid down by an eminent authority that, in the case of the gift of a chose in action, the law requires a written assignment, or some equivalent instrument to effect the transfer, and this doctrine seems to be well supported by both reason and authority.

It has been held, however, that where a gift of stock has been fully executed so as to transfer to the donee the legal title, the fact that the donor retains the certificate in his possession is immaterial. *Roberts's Appeal*, 85 Pa. St. 84.

And it has also been held that the delivery of the written assignment of the chose in action is a good delivery of the chose in action, and is sufficient to support a gift.

The question as to what change of possession is required to support a gift is often necessarily a relative one. The mere open and visible change of possession is obviously not possible in all cases. Thus, where the donor and donee reside together, as in the case of husband and wife, parent and child, etc., it is not required that the thing given should be removed from their common residence. It is sufficient, if it clearly appears that the donor had relinquished, and the donee had acquired, all dominion over, and control of, the property. Many cases are cited in support of this doctrine on page 1024 of the volume of encyclopedia above cited, including *Davis* v. *Zimmerman*, 40 Mich. 24, and *Colby* v. *Portman*, 115 Mich. 95 (72 N. W. 1098).

And it has been held in this State that under some circumstances the donor may constitute himself a trustee for the donee, and in such case no further delivery is necessary. See *Love* v. *Francis, supra.* We have cited cases where the donor acted as the agent of the donees in handling the property. Although delivery is essential to perfect the gift, it is not necessary that the donee should retain the property in his possession. The subsequent possession by the donor, while it may in some cases tend to throw suspicion upon the transaction as being in fraud of creditors, is not necessarily incompatible with the donee's dominion over the property; and, if satisfactorily explained, will not divest the donee of the title to the property when once it has been acquired by him.

An examination of the cases above cited will show that the several statements of the rule vary in language, but not in substance. In the application of this rule, it is well settled that if there has been an actual or constructive delivery of the subject-matter of the gifts, with the intent to vest title, the fact that the donor retains possession of the same for any purpose is not sufficient to defeat the gift; nor is the gift defeated by the fact that the donor reserved to himself the use or income from the subject-matter of the gift.

In *Beaumont* v. *Beaumont, supra,* the owner of certain bonds rented a box from a safety deposit company in the name of himself and his two brothers, whom he took to the company, introduced them there, and had them sign the contract of renting, and then went with them to a room, taking the box and the bonds. He then handed one-half of the bonds to each brother, stating that they were a gift, and that he desired them to give him the coupons therefrom which should mature during his lifetime. Some of the coupons next maturing were then cut off and given to him. The bonds and the coupons were then placed in the box, which was put back in the vault; he taking one key and giving them the other. Held, that the fact that he retained a key, and that he afterwards visited the vault and took coupons from the box, was not such a retention of control over the bonds as to invalidate the gift. Gray, J., said:

"The underlying question of these assignments is, What are the essentials required by the law to constitute a valid gift of personal property *inter vivos,* in a case like the present? Undoubtedly there must be shown an intention to give; that is, an expressed purpose to divest the donor of title in, and ownership of, the thing given, carried into effect and evidenced by a delivery of possession to the donee, and acceptance by him. It, of course, inheres in the conception of the possession essential to a completed gift, that the donee should have such control, and such control only, of the subject-matter of the gift as is consistent with the ownership purported to be transferred to him. What shall constitute the essential delivery, possession, or control, must depend always on the circumstances of each case and the environment of the parties. Where delivery of the property has once been made, and possession transferred, the gift is irrevocable, and is not affected by the fact that the donor immediately thereafter comes into the physical possession and control of the property, without any retransfer of the ownership by the donee. *Corle* v. *Monkhouse,* 50 N. J. Eq. 546 (25 Atl. 157); *Matthews* v. *Hoagland,* 48 N. J. Eq. 455 (21 Atl. 1054). This being so, we see no reason why a gift should not be affected by a condition requiring tem-

porary or partial control of the thing given by the donor, where the intention to transfer the ownership is made clear, and a possession commensurate with that ownership conferred upon the donee."

We must desist from further quotation from these authorities for want of space. We cite only the following in conclusion: *Crittenden* v. *Insurance Co.*, 41 Mich. 442 (2 N. W. 657); *Mutual Benefit Life-Ins. Co.* v. *Savings Bank*, 68 Mich. 131 (35 N. W. 853); *Whitford* v. *Horn*, 18 Kan. 455; *Ivey's Adm'r* v. *Owens*, 28 Ala. 641.

In the last-cited case the donor repossessed himself of the gift until the donee was older, and upon that subject the court said:

"Although an actual delivery is indispensable to perfect a parol gift of a slave, yet it is not necessary that the actual possession should be afterwards retained by the donee. Subsequent possession by the donor is not necessarily incompatible with the donee's dominion over the property; nor is it conclusive evidence that there was no delivery, or that the dominion did not pass to the donee."

Much depends upon the circumstances of the case. We are dealing here with transactions between a father and his sons, in both of whom he had implicit confidence at the time of the transactions of 1896 and 1899 in question, and for years thereafter. The safe in which these securities were placed and kept was accessible at all times to both donor and donees. They all placed their marks upon these transactions in such a way as to indicate, in our judgment, the intention of the father to then make absolute gifts to the sons of these securities. We are unable to find an indication, for years, by any of the parties dealing with these papers, of any other intention than that the sons were the owners of these securities. They dealt with them as their own. The father dealt with them as belonging to the sons. It is undisputed that both the complainant and the defendant had access to the securities, or alleged gifts of 1896 and 1899, at all times, and that

they looked them over whenever they wished; and, in fact, carried away a considerable part of them, as is evidenced by documents in evidence. Their letters show that they treated them as theirs.

The conduct of the defendant with reference to the transaction of 1896, as evidenced by the account kept by him and called his "Present Acct.," is significant. Beginning with 1858 and closing with January 1, 1897, upon one page, only, that is before us, of his private account, there are entered numerous gifts by the father to him, down to and including the 1896 transaction. After the breach between the complainant and defendant much correspondence took place between them, which we have not space to quote. A settlement was desired. The complainant was clamoring for an adjustment of his matters, as claimed by him. At this time he knew nothing of the assignment, or the will of 1902, so far as appears of record. In fact, it seems to be conceded that at that time he supposed that the will made by the father in 1890 was still in force, in and by which will the property was to be equally divided between the sons, and full confidence in them both is there expressed, by making them executors of the will without bond, and trusting to their honor and integrity to look after their mother's interests. We think it clear that in August, 1902, the father had changed his mind. He may not have understood the legal effect of the prior transactions.

In a letter, dated Battle Creek, February 20, 1904, the defendant writes the complainant the following:

"Alf: Yours of the 16th received. We supposed you had copies of all transactions, as you had use of the books and have done about all of the work. If you will tell me what information you lack we will see if we can figure it out. Send a statement as far as you can and we will try to complete it. It is necessary that you give this immediate attention. Father has worried about this until his nerves are about exhausted; can't sleep nights; and on Wednesday became paralyzed on his right side, for about three hours we could not guess at the result. There must

be some basis of settlement, and I would like your understanding of what father was to have of the last lot of papers he gave us. Write us fully. If your understanding agrees with ours, I will go ahead and see if I can figure out a satisfactory settlement. You are aware that it is a big job. If you want me to do so, I wish you would send me copies of the papers you have drawn off from the books, as it will be easier to check up than draw them off, and besides I can call your attention to mistakes, if any. When father gave us the papers he was to have $2,500 from each of us, or $5,000 a year for caring for the papers and for his own use. It will be impossible to tell how much to carry down each year unless it is settled as to the amount he was to have, and there is no use in undertaking a settlement unless we can finish it. I just handed this to father and he said that it is all right, excepting he thought he was to have all he wanted. Yours truly, F. G. S."

In passing, it is proper to say that there is no competent evidence in the case of any agreement to pay the father any sum as an annual salary or allowance, although it had been proposed by complainant in a letter to his father of December 15, 1896. But if we were to find that the father was to have a stated sum, or so much as he saw fit to take of the income, from time to time, of these securities, we do not understand that that would be inconsistent with the giving to the sons of all the principal sum and so much of the interest or income as he passed over to them, or placed to their credit from time to time.

The circuit judge, in his written opinion filed in the case, first referred to the transaction of 1896. He used upon that subject the following language:

"After a careful consideration of all the testimony given in this case relative to this matter, I am of the opinion that it has been thoroughly established that this transaction was intended to be, and, in fact and in law, was a gift then and there fully consummated between the father and the sons. During the course of this hearing, there has been much controversy between counsel as to the admissibility of the testimony of either of the parties to this action relative to certain phases of this transaction, par-

ticularly the question as to whether or not there was delivery made by the father to the sons; but I am of the opinion that whether we include or exclude the testimony of the parties to the suit, the fact of this transaction resulting in a consummated gift is established by a very decided preponderance of the evidence."

He then proceeds to deal with the transaction of 1896.

We are in accord with the circuit judge upon this branch of the case, except in so far as he deals with the "Hofer loan." He finds that it appears from the evidence in the case that the complainant is the owner of $9,000 of the principal sum of this loan, and that the defendant is the sole owner of the remaining $8,000 of the principal sum, and yet he proceeds to find a sum due the complainant upon this transaction, and charges the defendant $6,080.50. We are unable to understand why this charge was made. In this we cannot agree with the circuit judge. We think that the amount which he carries against the defendant growing out of the "Hofer loan" should be eliminated from the finding. The circuit judge then deals with the transaction of 1899, and with his conclusion in that matter we are content.

There remains, however, to be noticed the controversy between the parties as to matters grouped together in the opinion, and known as the Nichols & Shepard notes, aggregating in principal $29,000. In regard to this matter, the court uses the following language:

"It has been somewhat difficult to determine from the evidence in this case as to whether or not there has been a consummated gift of these notes, or any portion of them, for the reason that testimony is less satisfactory as to there ever having been an actual or a constructive delivery by David Shepard of any of these chattels."

The circuit judge, however, allows the complainant, and requires the defendant to account to the complainant for, one-half the principal sum of these three notes, together with interest thereon, aggregating the sum of $17,638.84. Holding, as we do, that the testimony of

both complainant and defendant, relating to the alleged conversations with the father touching these matters, should be eliminated and not considered, we are unable to find evidence in the case to warrant us in following the circuit judge in the conclusion which he reached in regard to these notes. The evidence of record respecting the dealing of the father with these notes shows that they were not treated as were the transactions of 1896 and 1899. That he may have passed to them a credit for an installment of interest upon these notes, which installment he intended to give to them, and that these notes may have been indorsed by him to them, or taken in their names, would not of themselves be sufficient acts to comply with the rule which we have attempted to lay down. We are constrained, therefore, to hold that the circuit judge should not have allowed this credit to the complainant.

This leads us to the conclusion that the decree of the circuit court should be modified as herein indicated in the matters of the " Hofer loan," and of the notes known as the Nichols & Shepard Co. notes, that we have just referred to. In all other respects the decree of the circuit court will be affirmed, except that appellant will recover costs of both courts.

BIRD, C. J., and MCALVAY, BROOKE, and BLAIR, JJ., concurred.