### MAHAN v. PLANK et al.

(Circuit Court of Appeals, Seventh Circuit. April 12, 1923. Rehearing Denied May 16, 1923.)

No. 3112.

1. **Gifts ⬤⟶48—Letter reciting the gift cannot be changed by extrinsic evidence.**

In a suit to recover shares of bank stock alleged by complainant to have been a gift to him from his father, since deceased, as evidenced by a letter reciting the gift, the letter and its contents must furnish the decisive test to determine whether a gift inter vivos was established, and the reasonableness or unreasonableness of the gift, or the relationship of the parties, or their subsequent actions, though possibly helpful to explain any ambiguous language, cannot change the status of either party, or the rights fixed by the letter of gift.

2. **Gifts ⬤⟶49(3)—Mere issuance of stock certificates to person claiming gift, without possession thereof, not necessitating finding of gift.**

In an action to establish a gift inter vivos of stock certificate, evidence that certificate was issued to plaintiff, unaccompanied by evidence of his possession, but, on the contrary, showing that possession remained in the giver, does not necessitate a finding of a gift.

3. **Gifts ⬤⟶47(1)—Burden on claimant to show intent of giver to part with title.**

In an action to establish a gift inter vivos of corporate stock certificates, the burden rested on plaintiff of establishing the intent of his father, the giver, to part with title at the time the alleged letter of gift was written.

4. **Gifts ⬤⟶47(1)—Presumption of gift from father to son offset by presumption arising from temptation to avoid inheritance tax by gift in contemplation of death.**

Though it is said that, because a father was dealing with his son, the court will more readily and easily find the intention to pass title in præsenti necessary to a gift inter vivos, yet the present existence of an inheritance tax law which, as a matter of common knowledge, impels accumulators to endeavor to pass title to their heirs in a manner or mode that will avoid such inheritance tax, furnishes a motive and inducement for transfers in anticipation of death, and gives rise to a presumption founded on a trait of human nature, that should be considered in determining whether a son, claiming a gift inter vivos from his parent, has sustained the burden of proving the giver's intent to presently part with title.

Page, Circuit Judge, dissenting.

---

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by Henry W. Mahan, Jr., against Jennie M. Plank and others. Decree for defendants, and plaintiff appeals. Affirmed.

T. J. Norton, of Chicago, Ill., for appellant.

Joseph B. Fleming and Louis G. Caldwell, both of Chicago, Ill., for appellees.

Before BAKER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellant by this appeal seeks to review a decree entered against him in a suit which he brought to recover certain shares of stock of the Washington Park National Bank, and which he claims were given to him by his father October 15, 1913, their enjoyment, however, to remain in the father until his death, which occurred May 25, 1919. The outcome depends upon the construction and effect of a certain letter written by the father to the son and herewith set forth in full:

"Chicago, Ill., Oct. 15, 1913.

"Henry W. Mahan, Jr., 1143 No. Los Robles Ave., Pasadena, Calif—My Dear Son: I am getting to be an old man, and had in mind doing a little something Christmas; but, as there is no time like the present, I want to do the following now:

"I want to leave something that shall be yours at my death, but at the same time I want to fix it absolutely now. I want to leave you 50 shares in the Washington Park National Bank, of Chicago, to be delivered to you at my death. This is worth to-day exactly $10,000 or more, and growing in value. It is paying dividends of $750 per year, and ought to always pay that or more.

"To accomplish this, it is necessary for me to get the dividends during my lifetime, to pay on more stock I have bought, but not fully paid for, so there will be still more to divide, if I continue to live and stay able to work. To do this, I inclose a certificate for 50 shares in your name, which please indorse on the back, where marked, and have your signature witnessed by any one, and mail to me at once, by registered mail. You will find it in a sealed envelope in my safe deposit box in this or the Washington Park National Bank, and I want you to keep it and not sell, unless all the other children decide together to sell, or, if you should ever sell, I want the other children to have the first right to buy at the market. I am asking each one to do this, as I want that bank to stay in the family control. I know you will obey my wishes in the matter. Also please sign the inclosed order to the bank to pay me the dividends during my life, and power to vote your stock.

"You may get this stock soon, or may have to wait a few years; but you and I, when this is fixed up, will have the satisfaction of knowing I had you in mind during my life, and wanted to do something that would show such to be the case after I am through. I inclose you a copy of how I have divided with your mother and the children. I trust you will think it fair, and am writing each one an exact copy of this letter. If I live, there will be more to divide, if I make the money. At any rate, I trust your judgment will be that I have accomplished, not all my heart hoped for, but have done something at least that has proven an ordinary's father's love for you.

"May God bless and keep you always.

"Your loving father, H. W. Mahon.

"P. S.—You understand that your stock is worth much more when it is kept in the family, or when the family control the majority of this stock. Kindly sign inclosed, which helps to accomplish that. This market now is over $200.00; but, if all should sell together, it would probably bring $275 to $300 per share.

"You will also note that I have attempted to divide $75,000, and I have given your mother $100,000, so that she is sure of a good income, and will have more to divide, when she is through, than I had. I think you will agree that I have been thoroughly fair in the matter.

"This is reason I have deeded Pasadena house to Adelaide. Real estate depreciates. Bank stock increases in value, so while hers looks a little bigger, it is not, as you have your share in bank stock, which will grow faster in value. I have also an extra insurance policy for $2,000—$1,000 to you and $1,000 to Adelaide."

Other facts alleged to have a bearing upon the question of intent are: The certificate of stock referred to in the letter was a blank one, and the son assigned it to the father before it was filled out and executed by the bank. On October 31, 1913, this blank certificate was filled out and executed by the bank, and ran to the son; but the father retained its possession until it was surrendered January 3, 1916, and new certificates issued in lieu thereof. In 1914 and 1915 appellant was asked by the bank to sign and execute a power of attorney to vote this stock at the annual meeting of the bank. No dividends were ever paid to appellant, who was 17 years of age at the time the alleged gift was made, and reached his majority in August, 1917. His father was president of the bank at the time he wrote the letter. A very similar letter was written and sent to a daughter at the same time. Instead of bank stock, other property was mentioned in this letter to the daughter.

The issue which we must determine is an extremely narrow one— a question of intent. We must decide an issue of fact, making our deductions from evidence that has given rise to conflicting inferences. In the last analysis, it is a question of the weight to be given such inferences. If, from the language of this letter, we can read an intent to make a gift in præsenti, then the decree must be for appellant. The trial judge found against him, and the legal presumptions bearing on the controverted issue strengthen the finding. Such oral testimony as was received, and concerning which there is any doubt or dispute, must also be resolved in favor of appellees, for presumably the trial judge resolved such facts in their favor.

[1] While there is certain evidence outside the letter which the court properly received as bearing upon this question of intent, it is the letter and that document only that must furnish support for appellant's contention that a gift inter vivos was established. The reasonableness or unreasonableness of the gift is not before us. Nor can the relationship of the parties or their subsequent actions either enlarge or narrow the effect of the letter. The motive for the father's subsequent action is not disclosed, and any statement of counsel dehors the record, must be ignored. In other words, the letter is the sole source of appellant's title, and, while subsequent or contemporaneous action may help explain any ambiguous language indicative of intent, such action is not capable of changing the status of either party or the rights fixed by the letter. Nor can the subsequent action of either or both parties throw much light on the question of intent in the instant case, because the letter itself leaves little or no room for uncertainty.

From a reading of this communication, we immediately gather the impression that the father was contemplating a testamentary disposi-

tion of his estate and all of it. It appears that his entire estate, consisting of $240,000, with debts aggregating $45,000, was under review, and the full distribution thereof among the natural objects of his bounty, the subject of his immediate attention. But when—before or after death—were the gifts to take effect? Were they to be "in præsenti," or were the gifts to be effective only after death?

Turning to the letter and examining it microscopically, with the sole purpose of answering this question, numerous passages at once force themselves upon our attention (italics are used to direct attention to significant words):

"I want *to leave something* that shall be yours *at my death,* but at the same time I want to fix it absolutely now."

"I want *to leave you* 50 shares in the Washington Park National Bank of Chicago, *to be delivered to you at my death."*

Could intent have been more clearly expressed in these preliminary sentences? It would have been easy to have given the stock outright, if such were the father's intent. The two quoted sentences so clearly indicate that a testamentary document, as distinguished from a gift inter vivos, was being drawn, that further search is hardly necessary. But the letter says more. Speaking of the certificate of stock:

"You will find it in a sealed envelope in my safe deposit box, in this or the Washington Park National Bank, and I want you to keep it and not sell, unless all the other children decide to go together."

Evidently this sentence was inserted that the son might locate the certificate *after the father's death.* Again:

"You may get this stock soon or may have to wait a few years."

Certainly there is no evidence of an intent to pass title in this language:

"You and I when this is fixed up, will have the satisfaction of knowing that I had you in mind during my life, *and wanted to do something that would show such to be the case after I am through."*

Comment is unnecessary.

Another significant sentence is the succeeding one:

"I inclose you a copy of how I have divided with your mother and the children. I trust you will think it fair, and am writing each one an exact copy of this letter. *If I live there will be more to divide, if I make the money."*

If a gift inter vivos were intended, why submit an outline of the donor's plan to divide an entire estate among his wife and children, and indirectly solicit approval of the plan? The postscript contains two significant passages:

"You will also note that I have attempted to divide $75,000, and I have given your mother $100,000, so that *she is sure of a good income, and will have more to divide when she is through than I had."*

He speaks of the disposition by his wife "when she is through" in comparison with his own gifts implying here, what he has directly expressed elsewhere, that the value of the gifts is to be determined "when I am through." The last sentence worthy of consideration is found in the last paragraph of the postscript:

"This is the reason I have deeded the Pasadena house to Adelaide. Real estate depreciates. Bank stock increases in value, and so, while hers looks a little bigger, it is not, as you have your share of bank stock, which will grow faster in value."

In other words, the property represented by the Pasadena house, which was given Adelaide, was worth more at the time the letter was written than the 50 shares of bank stock, but inasmuch as "real estate depreciates," and "bank stock appreciates," there would be approximate equality in the value of the gifts at his death, which he then evidently believed would not be long postponed.

The only persuasive language indicating a contrary intent is found in the sentence:

"Also please sign the inclosed order to the bank to pay me the dividends during my life and power to vote *your stock.*"

[2] Standing alone, this would well support appellant's claim of a gift inter vivos. But it must be read as a part of the entire letter, and, so read, is consistent with the plan to make a testamentary disposition of the property. It must be borne in mind that the father first obtained a blank certificate of stock, which he had his son assign to him before it was filled out and executed by the bank officials. After securing this certificate thus assigned, he presented it to the bank and surrendered stock standing in his own name. He then had in his possession the certificate on the back of which was an assignment from his son to himself. He also asked for and obtained (before the stock was issued) an order from the son directing the bank to pay all dividends to him during his life.

Bearing in mind that we are not called upon to determine the legal effect of such transactions, nor the validity of the assignment or of the order, the probative value of these acts in determining the father's intent remains, and cannot be ignored. They are most significant, for they indicate an intention on the part of the father to take all the necessary steps and precautions to retain possession and control of the certificate of stock (and in fact the paper title), with the attending authority to transfer and retransfer it during his life, as changing circumstances might indicate or require.

Even though no assignment were executed, the possession of the stock certificate by the father is most significant. It may well have been the basis for a finding in appellees' favor. For the issuance of the stock certificate, unaccompanied by possession, would not necessitate, nor, standing alone, support, a finding of a gift inter vivos. Allen-West Commission Co. v. Grumbles, 129 Fed. 287, 63 C. C. A. 401; Bowen v. Kutzner, 167 Fed. 281, 93 C. C. A. 33; Walker v. Walker, 66 N. H. 390, 31 Atl. 14, 27 L. R. A. 799, 49 Am. St. Rep. 616; Cummings v. Bramhall, 120 Mass. 552.

[3] Nor can we ignore the rule of law respecting the burden of proof and the quantum of evidence necessary to overcome such burden that applies in a case of this character. Allen-West Commission Co. v. Grumbles, supra; Merchants' Loan & Trust Co. v. Egan, 222 Ill. 494, 78 N. E. 800. We have been urged to reach a different conclusion because of the relationship of the parties. In other words, it is con-

tended that, because the father was dealing with a son, the court should more readily and easily find the intention to pass title in præsenti, without which the gift cannot be sustained. Our attention has been directed to the decisions in Beaumont v. Beaumont, 152 Fed. 55 (59), 81 C. C. A. 251; Innes v. Potter, 130 Minn. 320, 153 N. W. 605, 3 A. L. R. 896; Shepard v. Shepard, 164 Mich. 183, 129 N. W. 201, 209. But we do not think they are helpful, much less controlling. In fact, their weight has been greatly impaired, if not destroyed, by the enactment of inheritance tax laws by the various state Legislatures and the Congress.

[4] The considerations, based largely on common observations, which lead to the announcement of a rule of law requiring a lesser quantum of proof to establish such a gift where the donor was dealing with a child, are now offset by facts, equally a matter of common knowledge, arising out of the application and enforcement of these inheritance tax laws. In fact, it would be better to say that no different rule of law applies, but that the relationship of father and son, in and of itself, gives rise to inferences which tend to establish the necessary element in a gift inter vivos—intent to pass title in præsenti. Just as the relationship, which, when shown, implies love and affection and confidence, furnishes an explanation for the transfer of one's property during lifetime, so does the existence of the inheritance tax law provide a motive and an inducement for attempted testamentary bequests executed with the hope of evading or avoiding the transfer tax. As a trait of human nature is the basis of the presumption in the one case, so should it be considered in determining the intention to be drawn from a donation such as the one we are here studying.

To hold and enjoy one's property, and yet to provide for its passage to children, unburdened by inheritance tax or administration expenses, has been the task and the worry of many an accumulator during the later years of his life. The decedent could have easily transferred this property and made doubt and dispute impossible. To have done so, however, would have necessitated his surrendering the title to, and the control of, his property, and all the enjoyment that was incident thereto. The rights and privileges of ownership, however, he wished to retain. The pleasure of adding to his accumulations (that he might perhaps have the more to give to his wife and children) he wished to enjoy, and frankly so states in his letter.

Whether the result was fortunate or unfortunate, whether the final disposition of his property was less equitable or more just, cannot concern us. Upon the appellant rested the burden of establishing the intent of his father to part with title at the time the letter was written; and this task carried with it the burden of showing the transfers to the mother and sister were also made under similar conditions. We are convinced that the burden resting upon appellant to establish an intention to make a gift in præsenti has not been met.

The decree is affirmed.


PAGE, Circuit Judge (dissenting). I am unable to agree with the majority opinion. The only contradiction in the record is between

the letter of October 15, 1913, which says, "I inclose a certificate for 50 shares in your name," and the testimony of Olson, who said, "Stock certificate No. 139 [the one in question] was issued on October 31, 1913." The majority opinion must have taken the statement of Olson as the basis for the following:

> "The certificate of stock referred to in the letter was a blank one, and the son assigned it to the father before it was filled out and executed by the bank. On October 31, 1913, this blank certificate was filled out and executed by the bank."

Here is the evidence on that point, viz.:

| | |
|---|---|
| Letter dated October 15, 1913, states: "I inclose a certificate * * * in your name. * * * Mail to me at once by registered mail." | Olson said: "Stock certificate No. 139 was issued October 31, 1913." |
| Plaintiff testified: "Stock was received. * * * Immediately endorsed the certificate. * * * I had possession of the stock only during the interim while receiving that letter, and sending to my father the certificate and authority as requested." | Plaintiff testified: "I received the letter shortly after October 15, 1913." |

When Henry W. Mahan, Sr., president of two banks, said "I enclose a certificate for 50 shares in your name," it must be presumed that he used those words as they are ordinarily understood, namely, that he was sending the ordinary signed stock certificate. The letter had a typed postscript and a later one in the father's own handwriting. Probably the mailing of the letter was delayed. Originally, the date of the certificate might have been omitted, and afterwards supplied. Both of those things seem more probable than the conclusion that only a blank piece of paper was in the letter. If the paper, which the letter said was a certificate, had in fact been indorsed by plaintiff before it was issued by the bank, then Olson, the cashier, when he issued it, must have encountered a set of very unusual circumstances, viz. he was called upon to sign a certificate that had already been removed from the stock certificate book, and that, judging by the condition of the original letter in evidence in which the certificate was inclosed, had been folded, and already bore the indorsement of the person to whom the bank was issuing it. It seems obvious, if those unusual conditions had existed, Olson would have told about them on the witness stand, instead of simply giving the date borne by the certificate.

The father delivered to plaintiff a paper, and procured his signature thereon, on the statement that it was a certificate. If it was subsequently signed by the bank, why should not the subsequent signing by the bank inure to the benefit of the plaintiff as of the day of its delivery by the letter to plaintiff? The bank treated his signature as sufficient authority to transfer the stock on its books. If plaintiff signed a blank, the bank officials knew it. In the case of Colton v. Williams, 65 Ill. App. 466, one Mary A. Gordon, during the lifetime of her husband, Joshua R. Gordon, was the owner of certain shares of bank stock, which stood on the books of the bank in her name. She died in 1874, leaving her husband as her sole heir. He never had the

stock transferred upon the books to himself, and after 14 years he married another woman, whose married name was identical with that of the first wife, viz. Mary A. Gordon. In 1888 he went with his second wife to the bank and told the president of the bank that he had given the stock to his wife, and that the bank officers should allow her to receipt for dividends, which was done. The court say:

"When he gave the stock to the second Mary A. Gordon, the appellant, the title by registry in the books of the bank already stood in that name. If the title to stock could only pass by conveyance, the substitution of one Mary A. Gordon for another would not suffice for that purpose, but a conveyance was not essential to that end; and when it was agreed that appellant was the person designated by that name on the books as the stockholder, owning the shares given to her, and she was subsequently treated as such, we think it was sufficient."

It was held that there was a transfer of the stock to the second Mary A., notwithstanding the fact that the certificate was found among her husband's papers in the safe in his store after his death. Mahan, Sr., did much more. He delivered the stock to plaintiff, and then, if defendants' theory is to be accepted, he went to the bank and actually had the title changed on the records of the bank to plaintiff's name.

Unquestionably, personal property, as well as real property, may be separated into two or more valuable interests. The whole tenor and effect of the letter is that Mahan, Sr., intended at that time to give the stock itself to plaintiff, and intended to retain the dividends thereon during his life for the purposes stated in the letter, and at the same time protect his right to the dividends by putting the stock, after it was properly vested in his son, in a sealed envelope in his deposit box, where the son was told he would find it at the father's death. In Shepard v. Shepard, 164 Mich. 183, 201, 129 N. W. 201, 208, it is said:

"It is well settled that, if there has been an actual or constructive delivery of the subject-matter of the gifts, with the intent to vest title, the fact that the donor retains possession of the same for any purpose is not sufficient to defeat the gift; nor is the gift defeated by the fact that the donor reserved to himself the use or income from the subject-matter of the gift."

That the father intended to put the stock in the son's name, have it indorsed by the son, and returned to him, so that he could have control of it during his lifetime for the sole purpose of securing and protecting his right to the dividends, separated from the interest in the stock given to the son, is very clear. The statements in the letter, such as, "I want to leave you something that shall be yours at my death," and "I want to leave you 50 shares in the Washington Park Bank to be delivered to you at my death," mean nothing more, on reading the whole letter, than that the son's realization of benefits from his stock was necessarily to be postponed until a time when the dividends would go with the stock, upon the father's death, and that the stock, returned to and to be kept by the father for the sole purpose stated, would be found in a sealed envelope and delivered to the son at the father's death. That language simply means that the impounded stock would then be released, not that the son was then to acquire title.

The majority opinion quotes from the postscript, viz.:

"You will note that I have attempted to divide $75,000, and have given your mother $100,000, so that she is sure of a good income, and will have more to divide when she is through than I had,"

and construes this language to mean that the value of the gifts was to be determined "when I am through." As I read that sentence, it simply means that he had given $100,000 to his wife, and kept only $75,000 to give, and which he was then giving, to the children, and that the mother would have, at her death, more to distribute to the children than he had to give to them, after he had given the $100,000 to the mother. The words "than I had" certainly cannot refer to the time of the death of the donor.

There are other elements in the letter that should not be ignored. After telling plaintiff, "I inclose a certificate for 50 shares in your name," he asked plaintiff to exercise three acts of ownership over the stock, viz. to indorse it, to sign an order to the bank to pay the dividends to the father, and to sign a proxy to the father to vote "your stock." Subsequently, in December, 1914, the father recognized the son's ownership by asking him for a second proxy to vote the stock, and the bank, both in 1914 and 1915, recognized plaintiff's ownership of the stock by giving him notices of stockholders' meetings.

The father caused the stock to be retransferred in January, 1916, and the majority opinion of the court says:

"The motive for the father's subsequent action is not disclosed."

It seems to me that the motive is found in plaintiff's testimony, viz.:

"My father and mother were separated on July 16, 1916, that being the date of the decree. The estrangement came about the latter part of December, 1915. I took my mother's part in the estrangement."

The majority opinion further states:

"The possession of the stock certificate by the father is most significant."

The letter clearly shows that there was one interest in the stock itself and another interest in the dividends, and it must not be forgotten that the dividends were drawn solely upon plaintiff's order upon the bank to pay them to the father. Nor should it be forgotten that the father voted the stock solely as proxy and agent for plaintiff. The possession of the stock, under such circumstances, was not at all significant of anything opposed to the theory of a gift to the plaintiff. There was no issuance of the stock unaccompanied by delivery and possession. Undeniably there was a delivery of a signed or an unsigned certificate of stock into the possession of the plaintiff. That completed and ended that part of the transaction.

Thereafter plaintiff, under instructions of the letter, started another and wholly separate transaction, namely, the impounding of the stock with the father to protect the father's rights to the dividends. For that purpose, and that purpose only, plaintiff indorsed it as his stock and sent it to his father. It is very significant that every act thereafter on the part of the father was a recognition of plaintiff's ownership of the stock, until the taking sides with his mother in her difficulties with the father caused the father to break faith with his son and violate the trust under which he held the stock.

The majority opinion cites Allen-West Com. Co. v. Grumbles, 129 Fed. 287, 63 C. C. A. 401. Upon the facts, that case is wholly different from the case at bar. I am convinced that the law of the Allen-West Case, applied to the facts of this case, will support plaintiff's contention that there was a valid gift. It must be remembered that, as stated in the Colton Case, supra, there is no question of creditors here involved, as there was in the Allen Case. In the Allen Case there was no attempt to deliver the stock until after insolvency. Grumbles kept the certificates, voted the stock, and drew the dividends by virtue of being the recorded owner of the stock on the books of the corporation, which never had notice of the so-called assignment. In the case at bar, the donor, upon the books of the bank, divested himself of all record interest in the stock, voted the stock by virtue of a power of attorney from the plaintiff, and drew the dividends by authority of a written order from plaintiff. The Allen Case lays down the broad general rule as follows:

"Among the indispensable conditions of a valid gift are the intention of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject of the gift in præsenti at the very time he undertakes to make the gift."

Thereafter Judge Sanborn, delivering the opinion, reviews at great length a number of decisions bearing upon the question of what constitutes a valid gift inter vivos, and from that discussion and the authorities cited it is clear that delivery may be made and possession given in many ways. For instance, Judge Sanborn in his opinion says:

"In Grymes v. Hone, 49 N. Y. 17, 10 Am. Rep. 313, a gift by means of a written assignment of 20 out of 120 shares of stock that were evidenced by a single certificate was sustained."

Again, the Allen Case says:

"In Banks' Adm'r v. Marksberry, 3 Litt. 276, a gift by an assignment of the future income of a slave was held valid—without a delivery of the subjects of the gift."

Other authorities are cited to show that there are many substitutes for the strict and actual delivery of the thing given.

In Opitz v. Karel, 118 Wis. 530, 95 N. W. 948, 62 L. R. A. 982, 99 Am. St. Rep. 1004, the Supreme Court said:

"The essential requirement in cases of gifts is that such a delivery shall be made as the nature of the subject sought to be bestowed reasonably admits of. Many of the strict requirements to the transfer of property by gift, indicated by the earlier cases, have been removed or relaxed to give a freer exercise to such a disposition of property. This modification of the law applies to what may be the subject of a gift, as well as the manner of executing it."

In Thomas' Adm'r v. Lewis, 89 Va. 1, 15 S. E. 389, at page 398, 18 L. R. A. 170, 37 Am. St. Rep. 848, it is said:

"Delivery is essential. It may be either actual, by manual tradition of the subject of the gift, or constructive, by delivery of the means of obtaining possession. Constructive delivery is always sufficient when actual, manual delivery is either impracticable or inconvenient."

The subject matter of the delivery there was stock, bonds, etc., in a safety box. The court further said:

"The delivery of the keys to Bettie Lewis, with words of gift, by her father, upon his deathbed, invested her with the same means of obtaining possession that Thomas [the father] had, and made her the owner, with title defeasible only by recovery or revocation of the donor, or by a deficiency of assets to pay creditors" [that was a gift causa mortis]; "and the mere existence in Stephen B. Hughes' hands of a duplicate set of keys, for precaution against loss or accident, which he had no right or authority to use, did not impair the validity of the gift which he did make to his daughter in his last moments, in the most unqualified manner."

I am of opinion that there was a valid and completed gift to plaintiff.